UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 13-20364-CR-UNGARO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.

GUFRAN A. MOHAMMED,

     Defendant.

_____/

## DEFENDANT GUFRAN A. MOHAMMED'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE

This memorandum is submitted in support of a reasonable sentence that takes into consideration the factors under 18 U.S.C. § 3553(a) in the instant case.  Mr. Mohammed respectfully submits that, in taking all of those factors into account, this Court should sentence him to 100 months – 80 months below the advisory guideline range in this case.  For the reasons that follow, a sentence of 100 months would be sufficient, but not greater than necessary, to comply with the purposes of § 3553(a)(2).

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court transformed the Sentencing Guidelines from a mandatory scheme into an advisory resource. Post-*Booker*, the Court must consider the other factors listed in 18 U.S.C. § 3553(a) as well as the applicable advisory Guidelines range. *United States v. Talley*, 431 F.3d 784, 786 (11th Cir. 2005).

The § 3553(a) factors are well-known to the Court but are recounted here:

(1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)    the need for the sentence imposed–

    (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

1

        (B)     to afford adequate deterrence to criminal conduct;

        (C)     to protect the public from further crimes of the defendant; and

        (D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

    (3)     the kinds of sentences available;

    (4)     the advisory Guideline range;

    (5)     any pertinent policy statements issued by the Sentencing Commission;

    (6)     the need to avoid unwarranted sentence disparities; and

    (7)     the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

The Supreme Court has stated, on more than one occasion, that a sentencing court may, through the consideration of the § 3553(a) factors, tailor the sentence to the individual defendant. *See, e.g., Pepper v. United States*, 131 S. Ct. 1229, 1241 (2011); *Kimbrough v. United States*, 552 U.S. 85, 101 (2007). Indeed, a criminal sentence must reflect an individualized assessment of a particular defendant's culpability rather than a mechanistic application of a given sentence to a given category of crime.

Moreover, the Court is required to follow the decree in the "parsimony provision" contained at the outset of § 3553(a). This provision mandates that the Court impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes" of § 3553(a)(2). *Talley*, 431 F.3d at 786. Thus, the Court's task is to consider the seven listed factors contained in §3553(a), and then to employ those considerations in arriving at a sentence that is sufficient but not greater than necessary to accomplish the purposes of sentencing listed in § 3553(a)(2). Notably, the "weight to be accorded any given § 3553(a) factor is a matter committed to the sound discretion of the district court." *United States v. Clay*, 483 F.3d 739, 743 (11th Cir. 2007) (quotation omitted).

I.   **The Nature and Circumstances of the Offense and the History and Characteristics of Mr. Mohammed**

   A.   **The History and Characteristics of Mr. Mohammed**

Mr. Mohammed is thirty-one years old.  He was born in Warangal, Andhra Pradesh, India and was raised by both of his parents.  He and his family are of the Muslim faith.  When Mr. Mohammed was attending college in India, he, his youngest sibling, and his parents were granted authorization to enter and reside in the United States.  In May of 2003, they traveled from India to Los Angeles, California and initially stayed with Mr. Mohammed's uncle, who lived in San Bernardino County.  Once the family was settled, they moved to their own apartment and still remain in the same apartment building today.

In the fall of 2003, Mr. Mohammed returned to India to complete his final months of college there.  He graduated with a bachelor's degree in Information Technology. After graduating, he returned to live with his family in California.  He was steadily employed and contributed to his family's expenses on a regular basis.  While working, Mr. Mohammed pursued post-graduate courses at California State University in Los Angeles beginning in 2008.  He obtained a master's degree in computer science in 2010.

In early 2011, Mr. Mohammed applied for and obtained a job in Saudi Arabia as a computer software engineer.  He moved to Dhahran, Saudi Arabia, in March of 2011.  Shortly after arriving in Dhahran, Mr. Mohammed married Afshan Fatima, a twenty-four year old native of India.  Mr. Mohammed's and Ms. Fatima's marriage was arranged by their families.  They married on July 21, 2011 in Hyderabad, India after speaking on the telephone on a few occasions and meeting once in person. After their marriage, Ms. Fatima moved to Saudi Arabia with Mr. Mohammed.  In early 2012, Ms. Fatima became pregnant and returned to India to give birth to

their child, who was born in November 2012.  Their daughter, Zainab Fatima, now almost two years old, lives in India with Ms. Fatima and her parents.  Mr. Mohammed has not seen his daughter since 2012, when she was a newborn.

Mr. Mohammed has no criminal history.  Prior to this case, he had never even been arrested. According to his parents and his brothers, Mr. Mohammed was always a good student and an extremely hard worker.  A devoted brother and son, he always contributed to the household expenses, respected his mother and father, cared about his family, and complied with his family obligations.  He is extremely distressed about the suffering and worry he has caused them.

**B.     The Nature and Circumstances of the Offense**

There is no doubt that the offense committed by Mr. Mohammed is a serious one.  He conspired to provide material support through money transfers to al-Shabbab, a foreign terrorist organization based in Somalia, and to al-Qaeda in Iraq/al-Nusrah Front ("AQI/al-Nusrah Front"), a foreign terrorist organization based in Syria.  In total, Mr. Mohammed conspired to contribute: 22,115.25 United States Dollars; 14,400 Saudi Arabian Riyals; one gold bar of 100 grams; and a $400 Visa gift card to these organizations.

In fashioning a reasonable sentence in this case, Mr. Mohammed urges the Court to take into consideration that, contrary to many material support cases (which are discussed *infra*, section II), Mr. Mohammed did not take part in a specific plot against the United States, and there is no evidence to suggest that he was especially useful to al-Shabbab or AQI/al-Nusra Front.  Indeed, it is unclear what, if anything, his co-defendant Mohammed Said did with the wire transfers that Mr. Mohammed forwarded to him in Kenya.  Moreover, as this Court is aware, the purported agent of AQI/al-Nusrah Front, with whom Mr. Mohammed communicated

4

over a period of several months, was actually an online covert employee ("OCE") of the United States government.[1]

## II.        The Need to Avoid Unwarranted Sentencing Disparities

All terrorism cases are serious.  Nonetheless, courts across the country have shown great discretion in imposing mitigated sentences and sentences far below the advisory guideline range when warranted.  In fact, as discussed below, mitigated sentences have been imposed in cases where the conduct committed was much more egregious, severe and threatening than in the instant case.  The following is a sampling of material support and terrorism-related cases where the courts imposed sentences below the advisory guidelines.

### A.        Mohamed Abdullah Warsame - 92 Months Imprisonment

In *United States v. Warsame*, 651 F. Supp.2d 978 (D. Minn. 2009), the defendant pled to a single count of conspiring to provide material support to al-Qaeda – a designated foreign terrorist organization – and received a sentence of ninety-two (92) months imprisonment. *Id.* at 979.   In *Warsame*, the defendant traveled to Afghanistan in early 2000 and attended an al-Qaeda training camp.  At the conclusion of the first training camp, Mr. Warsame joined other fellow trainees and traveled to Kandahar, Afghanistan, where they sought admittance to an al-Qaeda training camp led by Usama bin Laden.  There, the defendant received military training, and met with, and attended lectures by, Usama bin Laden.  The defendant also provided his services to al-Qaeda as a security guard and by teaching English at a medical clinic for al-Qaeda associates. *Id.* at 980.

---

[1] In order to respect the privacy of Mr. Mohammed and his family, the remainder of this section is filed separately under seal. *See* Defendant's *Sealed* Supplement to Sentencing Memorandum and Motion for Downward Variance.

Upon returning to his family in Minneapolis, Minnesota (the return trip having been financed by al Qaeda), Mr. Warsame solicited money from others and wired the funds to a bank account in Pakistan at the specific request of a training camp commander known by the defendant in Afghanistan.  In doing so, Mr. Warsame knew that the funds would be used to support members of al Qaeda.  *Id.*

In considering what kind of sentence to impose on Mr. Warsame, the district court "carefully considered the sentences imposed in dozens of other terror-related cases in the United States in the last eight years." *Id.* at 982.  Specifically, the district court found guidance in the cases of Salim Hamdan, often described as the personal driver of Usama bin Laden (sentenced to sixty-six (66) months by a military jury), and the case of the "Lackawanna Six," referring to *United States v. Goba*, 2040 F.Supp.2d 242 (W.D.N.Y. 2003) (sentences ranging from 84 to 120 months).  *Warsame*, 651 F.Supp.2d at 982.[2]

Turning to the facts of the case before it, the district court in *Warsame* stated:

> While this Court has given its utmost consideration to all of the public and non-public information in this case – including all of the information that in any way implicates the national security of the United States – it simply finds nothing that adequately demonstrates that Warsame was part of a specific plot against the United States, and very little that suggests he was especially useful to al Qaeda, either during his training in the Middle East or upon his return to North America.
>
> In short, while participation of any sort in a terrorist enterprise is a deplorable step, and is appropriately dealt with harshly under federal law, the nature of that participation will of course vary, and not every participant will merit equal punishment.  That is especially important to bear in mind here, in a case involving no concrete evidence of any substantial involvement in al Qadea's operations or of specific violent actions . . . .

*Id.* at 981-982.

---

[2]These cases are discussed in more detail below.

The district court, taking into consideration Mr. Warsame's limited role along the spectrum of material support cases, analyzing other cases and sentences with similar type conduct, and acknowledging that the government itself was recommending a variance from the statutory maximum of 180 months down to 150 months, ultimately imposed a variance and sentenced Mr. Warsame to 92 months – roughly half of the guideline sentence.[3]

Mr. Mohammed's conduct in the instant case is similar, yet not quite as serious, as the defendant's conduct in *Warsame*.  Mr. Mohammed never sought to receive military training at a training camp and, aside from providing money, never provided other services to al-Shabaab or the AQI/al-Nusrah Front.  And, although like *Warsame*, Mr. Mohammed sent wire transfers to support these groups, he did not do so from the United States – nor did he communicate with anyone in leadership positions of these groups from the United States, as Warsame did.

**B.     Salim Ahmed Hamdan - 66 Months Imprisonment**.

Salim Ahmed Hamdan was accused of acting as Usama bin Laden's driver.  In addition, he was charged with arranging for the transportation of, and then actually transporting, weapons used by al-Qaeda.  Finally, he attended al-Qaeda training camps, and received weapons training. *See Hamdan v. Rumsfeld*, 548 U.S. 557, 570 (2006).

As stated in relevant part in the original charging document:

a.     In 1996, Hamdan met Usama bin Laden in Qandahar, Afghanistan and ultimately became a bodyguard and personal driver for Usama bin Laden. Hamdan served in this capacity until his capture in November of 2001. Based on his contact with Usama bin Laden and members or associates of al Qaida during this period, Hamdan believed that Usama bin Laden and his associates were involved in the attacks on the U.S. Embassies in Kenya and Tanzania in August 1998, the attack on the USS Cole in October 2000, and the attacks on the United States on September 11, 2001.

b.     From 1996 through 2001, Hamdan:

---

[3]It should also be noted that the district court considered the time Mr. Warsame had already served (67 months) in

    1)      delivered weapons, ammunition or other supplies to al Qaida members and associates;

    2)      picked up weapons at Taliban warehouses for al Qaida use and delivered them directly to Saif al Adel, the head of al Qaida's security committee, in Qandahar, Afghanistan;

    3)      purchased or ensured that Toyota Hi Lux trucks were available for use by the Usama bin Laden bodyguard unit tasked with protecting and providing physical security for Usama bin Laden; and

    4)      served as a driver for Usama bin Laden and other high ranking al Qaida members and associates. At the time of the al Qaida sponsored attacks on the U.S. Embassies in Tanzania and Kenya in August of 1998, and the attacks on the United States on September 11, 2001, Hamdan served as a driver in a convoy of three to nine vehicles in which Usama bin Laden and others were transported to various areas in Afghanistan. Such convoys were utilized to ensure the safety of Usama bin Laden and the others. Bodyguards in these convoys were armed with Kalishnikov rifles, rocket propelled grenades, hand-held radios and handguns.

c.      On diverse occasions between 1996 and November 2001, Hamdan drove or accompanied Usama bin Laden to various al Qaida-sponsored training camps, press conferences, or lectures. During these trips, Usama bin Laden would give speeches in which he would encourage others to conduct "martyr missions" (meaning an attack wherein one would kill himself as well as the targets of the attack) against the Americans, to engage in war against the Americans, and to drive the "infidels" out of the Arabian Peninsula.

d.      Between 1996 and November 2001, Hamdan, on diverse occasions received training on rifles, handguns and machine guns at the al Qaida-sponsored al Farouq camp in Afghanistan.

Charge Sheet, *United States v. Salim Ahmed Hamdan*, 3 (available at www.defense.gov/news/jul2004); *see also Hamdan* at 570, 126 S.Ct. at 2761.

In November 2001, during hostilities between the United States and the Taliban, Hamdan was captured by militia forces and turned over to the United States military. In June 2002, he was transported to Guantanamo Bay. *Hamdan* at 566, 126 S.Ct. 2749, 2759 (2006).   A year

---

conditions "significantly more onerous" than that of the ordinary pretrial detainee. *Id.* at 982.

later, President Bush declared Hamdan eligible for trial by military commission. *Id.* Hamdan challenged prosecution by military commission, which ultimately resulted in the Supreme Court's finding that the military commission lacked power to proceed in the prosecution of Hamdan.   After the Supreme Court delivered its opinion, Congress passed the Military Commissions Act of 2006. In the interim, Hamdan tried to work out a deal for a ten-year term of imprisonment, but that offer was rejected by the prosecution.[2]   The charges against Hamdan were expanded from mere conspiracy to include a charge of providing support for terrorism, and on December 21, 2007, the Combatant Status Review Tribunal ruled that Hamdan was an "illegal enemy combatant," who would be tried by a military commission.

Hamdan's trial began on July 21, 2008. During trial, the prosecution attempted to portray Hamdan as a hardened al Qaeda warrior. The jury of six military officers convicted him of supporting al Qaeda by driving and guarding bin Laden and ferrying weapons for the terror group.   At the time of sentencing, prosecutors sought a 30-year term of imprisonment. The military jury, unconvinced that Hamdan was anything more than a low-level al Qaeda figure, returned a sentence of 66 months.  *Id.*

Mr. Mohammed's conduct in this case in no way comes close to the actions that Mr. Hamdan took in support of al Qaeda from 1996 through 2001.  Unlike Hamdan, Mr. Mohammed was never tasked with carrying out sensitive activities such as delivering weapons, purchasing equipment, or being around high-ranking operatives planning specific attacks.   Analyzing the facts of Hamdan's case and the sentence imposed there militates in favor of a downward variance in this case.

---

[2]White, Josh and Branigan, William (2008-11-25) "Hamdan to Be Sent To Yemen," *The Washington Post*.

### C.    The "Lackawanna Six" - 84 to 120 months imprisonment

In this case, six defendants were accused of traveling from the United States to Pakistan, and then to an al Qaeda training camp in Afghanistan. *See United States v. Goba*, 240 F.Supp.2d 242, 244-45 (W.D.N.Y. 2003).  The defendants received firearms and tactical training, heard lectures justifying martyrdom, and attended a speech delivered by Usama bin Laden looking ahead to a fight against Americans. *Id.* at 244.  The defendants then returned to the United States, and in searches of their apartments following their arrests, authorities discovered a gun, a document justifying suicide as a form of martyrdom, and an email allegedly cryptically referring to a future terror operation.  *Id.* at 256.  The defendants ultimately received (some after cooperating with the government) sentences ranging from 84 to 120 months.

In contrast to the defendants in the *Goba* case, in this case, Mr. Mohammed received no training and had no contact with high-ranking members of terrorist organizations.  Moreover, there is no evidence that Mr. Mohammed possessed any weapons or participated in any violent acts.  There is also no evidence in this case that Mr. Mohammed assisted in planning or carrying out specific acts of violence against the United States.  In looking at the range of sentences imposed in *Goba*, Mr. Mohammed's request for a variance to 100 months is reasonable.

### D.    Richard David Hupper - 46 Months Imprisonment

This case, *United States v. Hupper*, Case No. 08-CR-20410-PCH, prosecuted in the Southern District of Florida six years ago, is similar to the instant case.  Mr. Hupper pled guilty to a one-count information, charging him with attempting to provide material support and resources (20,000 in U.S. Currency) to Hamas over a two-year period of time.  *United States v. Hupper*, 08-CR-20410-PCH, at D.E. 1 and D.E. 14.

Mr. Hupper became involved with a group known as the International Solidarity Movement ("ISM") when he traveled to the Middle East to aid Palestinians, whom he believed were not receiving fair treatment by the Israeli government or the press.  While overseas, Mr. Hupper devoted time and effort to the plight of the Palestinian people and also contributed funds to help them. (D.E. 14; 2).  Mr. Hupper was aware, however, that the funds he contributed, including a donation of approximately $20,000, was going directly to Hamas, the outlawed party of the Palestinians and a U.S. designated foreign terrorist organization.  *Id.*

As a result of his activities in Palestine, Mr. Hupper's Israeli visa was revoked and he was required to leave the country. *Id.*  Upon his return to the United States, he attempted to obtain a false passport so that he could return to Palestine.  *Id.*  Mr. Hupper was sentenced to two years on the false passport charges.  While serving his sentence on the false passport charges, the United States charged Mr. Hupper with attempting to provide material support to Hamas.  (D.E. 1).

Mr. Hupper pled guilty to the information.  At sentencing, he faced a statutory maximum of 15 years – 180 months – in prison.   The court imposed a forty-six (46) month sentence – less than a third of the guideline sentence of 180 months. (D.E. 18).[3] This sentence was to be served consecutively to the two-year sentence Mr. Hupper received on the passport fraud charges. Given that Mr. Hupper received, in total, a seventy-month sentence for his involvement with Hamas, Mr. Mohammed's request for a variance in this case is reasonable.

---

[3] While the sentencing memorandum filed on behalf of Mr. Hupper states that he cooperated with the government (D.E. 14; 3), there is no record of a 5K1.1 or Rule 35 motion being filed on his behalf in the court's docket.

### E.        Hor I. Akl and Amera A. Akl - 75 Months and 40 Months Imprisonment

In this case, Hor and Amera Akl, a couple from Toledo, Ohio, pled guilty to conspiring to provide material support to Hezbollah. *See, generally, United States v. Akl, et. al*, Case No. 3:10-CR-00251-JGC (N.D. Ohio 2003).   Over the course of a year, Hor and Amera Akl planned to send up to $1 million to Hezbollah, the Lebanese group designated by the U.S. as a foreign terrorist organization.  The Akls met multiple times between August 2009 and June 2010 with a confidential source who was working on behalf of the FBI. (D.E. 74).  During those meetings, the Akls discussed ways to secretly send money to Hezbollah leaders in Lebanon.  In  a  meeting on August 30, 2009, Amera Akl told the confidential source that she dreamed of dressing like Hezbollah, carrying a gun, and dying as a martyr. (D.E. 74; 13).   In another meeting on September 10, 2009, Hor Akl, in the presence of his wife, told the confidential source that he understood the money was being transported to "terrorists." He also stated he understood the funds would be used to target Israel. (D.E. 74; 14).

On March 1, 2010, Hor Akl traveled to Lebanon to meet with a highly-placed person in Hezbollah.  (D.E. 74, 18). On March 10, 2010, upon his return to Toledo, Ohio, Hor and Amera Akl met with the confidential source.  Hor Akl told the confidential source that, while in Lebanon, he met with representatives of Hezbollah, including a named Hezbollah official.  Mr. Akl further stated that, while in Lebanon, he discussed with the official a plan to send funds concealed inside appliances and automobiles shipped to Lebanon.  (D.E. 74; 19).

On June 3, 2010, the confidential source delivered $200,000 to the Akls at their home in Toledo and told them he would return later in the day with more money. (D.E. 74; 23). The Akls agreed to send the money by secreting it inside a 2004 Chevrolet Trailblazer, which they planned to send to Lebanon via a container ship. Shortly thereafter, the Akls were observed inside their

residence wearing latex/rubber gloves, in close proximity to various automobile accessories, plastic wrap, duct tape, latex/rubber gloves, and fragrant insect repellant sticks. (D.E. 74; 23). Hor Akl had prepared a portion of the money for concealment into the auto accessories, wrapped in plastic, and taped into a bundle. *Id.*

The Akls both pleaded guilty to conspiracy to provide material support to a foreign terrorist organization. Hor Akl also pleaded guilty to money laundering, bankruptcy fraud and perjury charges. Hor Akl received a sentence of 75 months imprisonment and his wife, Amera, received 40 months imprisonment.

With respect to the plan to send funds to support a terrorist organization, the facts of this case are similar to the facts of Mr. Mohammed's case. In contrast to this Hor Akl, however, Mr. Mohammed never traveled to meet with a high-ranking official of either al Shabbab or AQI/al-Nusrah Front. Unlike Mr. Mohammed, Mr. Akl was also convicted of other crimes in connection with the material support case, such as money laundering and fraud. Given that Mr. Akl received a 75-month sentence, Mr. Mohammed's request for a variance in this case is reasonable.

**III.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense**

A sentence of 100 months – 8.3 years – when considering the cases and sentences cited above, would adequately reflect the seriousness of the offense committed in this case. It would also serve as an effective deterrent to others who might be inclined to commit the crime of material support. Finally, a sentence of 100 months would promote respect for the law and the criminal justice system in this country, both on the part of the public and on the part of Mr. Mohammed.

In January 2013, prior to being taken into custody by the American government in this case, Mr. Mohammed was seized from his home by the Saudi Arabian General Directorate for Investigations (al Mabahith al-Ama) and imprisoned at the Dammam, Saudi Arabia al Mabahith prison for six months. He was not advised of his charges, was not brought before a court, was not provided a lawyer, and was repeatedly interrogated and physically assaulted. He did not see a judge until six months had elapsed, at which time he was further interrogated, was ordered to sign a document, and then was released.

Fortunately, Mr. Mohammed's experience in this country, thus far, has been different. He has been provided with counsel, the ability to know the charges brought against him, the ability to see the evidence against him, and the ability to be sentenced under a system that takes into account each individual that comes before the Court. A 100-month sentence would be a severe punishment for Mr. Mohammed, who has never, until now, come into contact with law enforcement in his entire life. However, such a sentence would be sufficient, but not greater than necessary, to accomplish the purposes of sentencing listed in 18 U.S.C. § 3553(a)(2).

WHEREFORE, the Defendant, Gufran A. Mohammed, respectfully requests that this Court grant his motion for a downward variance from the advisory guideline in this case and sentence him to a term of 100 months.

**MICHAEL CARUSO**
**FEDERAL PUBLIC DEFENDER**

By:  */s/ Helaine Batoff*
Assistant Federal Public Defender
Florida Bar No.: 0418617
150 W. Flagler Street, Suite 1700
Miami, Florida 33130-1556
Tel: (305) 530-7000
Fax: (305) 536-4559
E-mail: helaine_batoff@fd.org

14

**CERTIFICATE OF SERVICE**

I HEREBY certify that on October 20, 2014, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*/s/ Helaine Batoff*

15