```
                  UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF FLORIDA
                  Case No. 13-20364-Cr-UNGARO

UNITED STATES OF AMERICA,     )
                              )
            Plaintiff,        )
                              )
       -v-                    )
                              )
GUFRAN AHMED KAUSER MOHAMMED, )
                              ) Miami, Florida
            Defendant.        ) December 17, 2014
                              ) 10:04 a.m.


                  VOLUME 3 of 3 - Pages 1-18
              TRANSCRIPT OF SENTENCING PROCEEDINGS
                BEFORE THE HONORABLE URSULA UNGARO
                       U.S. DISTRICT JUDGE


APPEARANCES:

For the Government     RICARDO A. DEL TORO and BRIAN K. FRAZIER
                       Assistant U.S. Attorneys
                       99 Northeast 4th Street
                       Miami, Florida  33132-2111


For the Defendant      HELAINE B. BATOFF and SOWMYA BHARATHI
                       Assistant Federal Public Defenders
                       150 West Flagler Street
                       Miami, Florida  33130




REPORTED BY:           WILLIAM G. ROMANISHIN, RMR, FCRR, CRR
(305) 523-5558         Official Court Reporter
                       400 North Miami Avenue
                       Miami, Florida  33128
```

STENOGRAPHICALLY RECORDED COMPUTER-AIDED TRANSCRIPT

1 (Call to order of the Court)
2 THE COURT: Good morning. This is the United States
3 versus Gufran Ahmed Kauser Mohammed, 13-20364 for sentencing.
4 Who's here for the United States?
5 MR. DEL TORO: Good morning, Your Honor. Rick
6 Del Toro and Brian Fraiser on behalf of the United States
7 along with Special Agent Justin Acres of the FBI.
8 THE COURT: Okay. Fine. You can have a seat.
9 And who's here for the defendant?
10 MS. BATOFF: Good morning, Your Honor. Helaine
11 Batoff and Sowmya Bharathi from the Federal Defender's office
12 on behalf of Gufran Mohammed, who's present.
13 THE COURT: Okay. Fine. You can have a seat.
14 And who's here from Probation?
15 THE PROBATION OFFICER: Good morning, Your Honor.
16 Thomas Felasco on behalf of the U.S. probation office.
17 THE COURT: Okay. Thanks. You can have a seat.
18 So, where we left off was that in a way the Public
19 Defender's office, or Mr. Mohammed's lawyers in a way,
20 provoked an extensive inquiry into this issue of comparisons
21 and whether or not the sentence reflected in the PSI, the 180
22 months that the Government is asking for, was out of line with
23 other cases.
24 And then that led down all kinds of paths and caused
25 me to become alarmed, because there was such a wide range of

1  sentences across the country in these cases, that led me to
2  the 12-level enhancement, which seemed to be a big driver in
3  this case as to why we were at 180 months.
4          And I suppose that what happened is because you all
5  negotiated the plea, and obviously had good reasons for
6  entering into the plea agreement that you entered into, there
7  were no objections to the PSI and the PSI contained very
8  little explanation as to the basis for the 12-level
9  enhancement.
10         But now I am satisfied that the 12-level enhancement
11 is correctly applied for the reasons that are set fourth in
12 the addendum.  So I don't think there could be any exploration
13 for comparable sentences across the country other than looking
14 at cases at least with a 12-level enhancement.
15         Now, that being said, I think where this has all
16 taken me is that there are no meaningful comparisons that can
17 be made among these cases.  There is, I do not believe, a
18 persuasive argument that can be made about sentencing
19 disparity here.
20         So, where we left off also was I said to the defense,
21 you know, all you've argued to me is sentencing disparity.  I
22 know nothing about this man.  So, I am here to listen.
23         MS. BATOFF:  Your Honor, Mr. Mohammed would like to
24 make a statement.
25         THE COURT:  Okay.

1       MS. BHARATHI: Is it all right with the Court if he
2  stays he seated?
3       THE COURT: Yes, absolutely.
4       THE DEFENDANT: I would like to apologize to the
5  Court and to the U.S. Government and also I would like to
6  apologize to anybody else anywhere in the world who has been
7  affected during the course of my actions. And I would also
8  like to apologize to my parents, who took great deal of
9  struggle in order to give us a good upbringing in order I have
10 returned them with stress and deteriorating health. And I'm
11 also grateful to God that no life has been harmed during the
12 course of my actions.
13      I got carried way on the Internet and I thought I was
14 going to bring there peace and justice. But in the course of
15 during my incarceration, I have realized that from the media
16 and also from my discovery that instead of me contributing to
17 the peace, I contributed against it.
18      I would never do this, especially not only because
19 this is wrong and also staying away from my family, it's an
20 experience that I never want to have and this was really
21 painful and it is really hurting. And thank you for giving me
22 that opportunity to speak.
23      THE COURT: Okay. Thank you.
24      So, I think this really brings us to the end here.
25 I'm going to give the Government one last opportunity to

1  speak, and then I'll give the defense one last opportunity to
2  speak, and then the Court is going to impose sentence.
3              Okay.  Go ahead, Mr. Del Toro.
4              MR. DEL TORO:  Thank you, Your Honor.
5              Judge, the legal question that you have before you,
6  the question that's presented before you, is has the defense
7  met its burden to prove that he deserves a downward variance
8  from the sentencing guideline range as calculated by Probation
9  and which was not objected to by either party of 360 to life,
10 and what the defense is asking the Court to do is really
11 extraordinary.  It is a 72-percent downward variance.
12             Even if you say, well, 360 is not the minimum of the
13 guidelines because by operation of law because of the plea
14 it's 180, it's still a really substantial reduction from 180
15 months to 100 months, and what evidence is there to support
16 this extraordinary request for a downward variance.
17             When the Court first asked the defendant whether he
18 had any contrition, whether he had any statement to the Court,
19 without the benefit of any preparation, without the benefit of
20 weeks of being able to prepare, the defendant had nothing.  He
21 showed no contrition.  I submit to the Court that that was who
22 this man is, and that the statement that you just heard here
23 now is not worthy of belief.  It's not worthy of credit by
24 this Court.
25             And the reason for that is because the evidence in

1  this case, to which both sides have stipulated, to which both
2  sides have agreed, show a very different man, a man who from
3  the moment that he became a U.S. citizen was planning to
4  travel abroad to support multiple terrorist organizations.
5           He supported three designated terrorist
6  organizations:  al-Qaeda, al-Shabaab and al-Nusra Front.  And
7  he provided money to another nondesignated terrorist
8  organization, the Afghan Taliban, which was then involved in
9  killing U.S. service members, over $30,000 for weapons, for
10 support, for recruiting.
11          He engaged in recruiting of terrorist fighters for
12 al-Nusra Front and al-Shabaab, and perhaps most tellingly, he
13 approved for the use of his funds for an attack on Americans
14 or the UN.
15          Judge, the question before you is a fairly simple one
16 with respect to two 3553 factors that I think are most heavily
17 weighing on the Court:  Specific deterrence of this defendant
18 and the protection of the public.  So that brings up the
19 question of what potential does he have for recidivism.
20          Well, as I'm quoting to the Court, the Eleventh
21 Circuit has held that terrorists are unlike other criminals in
22 their high potential for recidivism.
23          But then the specific facts in this case also support
24 a finding that the defendant will submit another crime again;
25 that he hasn't shown true contrition to the Court; that he is

1  committed to an extremist, violent and irrational ideology
2  that thinks it's okay to murder innocent civilians, that
3  thinks it's okay to kill school children.  The defendant has
4  engaged in a pattern of criminal conduct, which I will briefly
5  summarize for the Court, which I think really speaks to his
6  potential for recidivism.
7         In a January 2009 e-mail, the defendant disseminated
8  Anwar al-Awlaki's 44 ways to support jihad.  That, Judge, is
9  the spiritual guide -- Anwar al-Awlaki was the spiritual guide
10 of many of the modern jihadis.  He was the spiritual guide.
11 He was the inspiration for Major Hasan Nidal, a U.S. Army
12 major who murdered 13 soldiers at Fort Hood, Texas.
13         In fact, on November 13, 2009, the defendant sent an
14 e-mail in which he refutes some of these arguments that Hasan
15 Nidal had committed a terrible crime as a Muslim, and he
16 states, "If, according to your definition, even if the
17 military personnel are innocent that were about to be deployed
18 to Iraq, then who are the criminals," suggesting that he
19 believed that it was the victims of that murder, those 13
20 victims, not Hasan Nidal, who was the criminal.
21         On May 30, 2010, the defendant sends an e-mail to
22 Sheikh Abdullah al-Faisal, who is another one of these jihadi
23 spiritual leaders who has inspired multiple terrorists, and in
24 that e-mail he says, "I have a question regarding the oath-
25 taking ceremony before the U.S. citizenship.  Is it allowed

isnomically to attend if I am planning to just stand and just say some dua, some statement, but not the oath. I am trying to get the citizenship just to get to the Middle East to get a job there so I can help my brothers who are struggling in Muslim countries with the finances." And we know what brothers he's talking about and we know which brothers he sent money for.

In December of 2010, the defendant sends an e-mail to an individual asking for information on traveling to Somalia, and the individual says to the defendant: "But I have to ask you this question. Are you coming to Somalia for jihad?"

The defendant's response was: "I can't give the answer to your question directly as the kafir, or the nonbelievers, spy on us, but it should be understood to you why I want to go to Somalia, in Shala, God willing."

And then he also mentions: "Is there any way to send the money to the brothers in Somalia?"

So this is who this person is. From the very beginning, not from the time of the CHS or the online covert employee of the FBI that was talking to him, but predating that time, back two years before that time he is radicalized and he is talking about jihad and assisting al-Shabaab and Somalia.

He tries to recruit Raja Tui Kan in May of 2011 and the CHS in June 2011. And then, on October 29, 2011, which he

1  is an administrator of a chat room for Sheikh Faisal, the
2  spiritual leader of many jihadis, the defendant says something
3  that is really telling about his potential for recidivism.
4  He's engaging in a chat where somebody talks about a news
5  report of deadly attack strikes that killed people who were
6  traveling in a bus in Kabul, Afghanistan, on behalf of NATO.
7  And the news headline is:  "Suicide bombing of NATO convoy
8  kills 17.  17 are killed as suicide bomb hits a U.S. bus in
9  Afghanistan."
10          The defendant says in response to that:  "May Allah
11 give them victory and make the Americans bleed to death.  May
12 them be blown into a thousand pieces each."
13          That's who this man is, not the man who after the
14 Court's prompting and weeks of preparation came before you and
15 spoke words of contrition.  That's who Gufran Mohammed really
16 is.
17          On May 13, 2012, in an online conversation with the
18 OCE, with the FBI online covert employee, the OCE states to
19 the defendant:  Right now I have two brothers who fought in
20 Iraq with the Islamic State of Iraq.  Islamic State of Iraq is
21 the precursor or the predecessor of ISIS or ISIL.  And they
22 are asking for grenade launchers.  "This amount will be
23 perfect to buy two of them.  I had not had the money before,
24 so if it is okay with you, that is what I would like to buy
25 with it."  They are experienced in using term AH.

1           The defendant replies: "Yes, brother. In the name
2  of Allah, praise Allah, go ahead, please."
3           On July 25, 2012, the OCE in a chat with the
4  defendant says: "There is a big attack against the kafir" --
5  the nonbelievers -- "being planned, specifically the Americans
6  and potentially the United Nations group. I am not going to
7  mention where, but I wanted your permission to use the money
8  you sent me to that."
9           His answer: "Yes, brother, go ahead in the name of
10 Allah."
11          Judge, the only way to answer the question that's
12 presented to you whether the defendant is really deserving of
13 this extraordinary reduction is to refer to his course of
14 conduct over the years, not to a one momentary response to a
15 Court's request several weeks ago where he couldn't muster a
16 simple apology.
17          For all of the reasons that we've cited in our
18 briefs, for all of the reasons that we've argued, because the
19 evidence doesn't support it, you should deny the defense
20 request for a 72-percent reduction and downward variance and
21 sentence him to 180 months.
22          THE COURT: Okay. Thanks, Mr. Del Toro.
23          Okay. Who's going to speak for the defense?
24          MS. BATOFF: Your Honor, of course, the evidence in
25 this case is terrible and that's why Mr. Mohammed pled guilty,

1  from the very beginning he was willing to admit his guilt in
2  this case, and the time that he took from the beginning of the
3  case till he actually pled guilty was more for his lawyers to
4  go through all the evidence and make sure we did our job.  But
5  from the outset he has never denied his guilt in this case.
6         With respect to his actions in this case, there's an
7  interesting concept that Samantha Power and Cass Sunstein have
8  written about called cyberbalkanization, and this is a
9  phenomenon that happens because the Internet has such power
10 and the danger of fostering extremism.  And they have said
11 that the Internet creates echo chambers; that your average
12 political blogger fills his rants with links with like-minded
13 cites and the world splits up into narrow communities that
14 rarely bother to read the other side.
15        And I think that's what we have in this case.  We
16 have a young man who, for whatever reason, was attracted to
17 certain chat rooms and things just spiraled out of control to
18 the point where he became, for lack of a better term,
19 radicalized.
20        But it's interesting because, this phenomenon of only
21 communicating with like-minded people on the Internet, once
22 Mr. Mohammed was arrested, brought back to this country, given
23 counsel, given process, something that he didn't experience in
24 Saudi Arabia, when he was arrested there, and was exposed to
25 all different sources of media that he wasn't exposing himself

to while he was living here before or that he wasn't getting in Saudi Arabia, he began to see that the way that he thought he was contributing to justice and peace in the world was actually doing the very opposite.

He knows that now. He wants to be reunited with his family. He will not do this again. You heard from him, Your Honor. And I think that when you take a young man who has never been in trouble with the law, who has never been in jail one day, and you think about a sentence that is sufficient but not greater than necessary to comply with the purposes of 3553(a), honestly, Your Honor, if you gave him five years, it would be significant punishment in this case because he has never been to prison. And, of course, because of the offense he has committed, the type of place he's going to be sent to to do his time is going to be very restrictive, very difficult for someone who has never been to jail a day in his life before this arrest.

The last thing that I'd like to say, Your Honor, is that you are allowed to consider the conditions of confinement in Saudi Arabia in fashioning a potential variance in this case.

THE COURT: How long was he in custody in Saudi?

MS. BATOFF: Six months, and during that time he was in solitary confinement. He was not allowed to go outside, I think it was 15 minutes every month. He was repeatedly

1  interrogated and assaulted physically and he had no process.
2  He was given no lawyer.  He wasn't even given his charge.  He
3  was just thrown in jail, and finally, after six months, I'm
4  assuming at the behest of the American Government, the Saudis
5  let him go so that he could be picked up by the Americans.
6          The evidence in this case is terrible.  That's why he
7  pled guilty.  But the question before Your Honor is how long
8  is sufficient but not greater than necessary to punish him.
9  180 months is just too long.  It's not going to deter him more
10 than a sentence of 100 months or 80 months.
11         He's a young man who has never been in trouble with
12 the law before and he subjected himself to basically being --
13 he was susceptible to the propaganda that was on the Internet
14 that sort of spun out of control and he ended up here.
15         THE COURT:  Okay.  Thanks.
16         MR. DEL TORO:  Judge, may I just address that one
17 issue about pretrial confinement in Saudi Arabia?
18         THE COURT:  Sure.
19         MR. DEL TORO:  I don't think that the Court has the
20 authority to provide credit to a defendant based on the
21 treatment of another foreign government of the defendant
22 that's unrelated to this case.  Certainly, the Eleventh
23 Circuit has held that in the Padilla case and the Jayyousi
24 case that the Court erred in giving Jose Padilla 42 months'
25 credit for time spent in U.S. military confinement.

1          THE COURT:  I don't think I would give him credit
2   time served, but I'm not sure that I cannot take it into
3   consideration as part of the factors.
4          MS. BATOFF:  Judge, actually in Jayyousi, what they
5   held was that the length of the variance was not permissible.
6   But a District Court definitely can consider the circumstances
7   of someone's pretrial confinement to reduce your sentence.
8   It's a variance.  It's not that we're asking for credit.  It's
9   a variance.
10         MR. DEL TORO:  That's not what the Eleventh Circuit
11  has held.  What it held is that the Court can take into
12  account the harsh nature of Padilla's confinement in U.S.
13  military brigs, not a foreign Government in how they treat
14  them.  Otherwise, if a defendant was mistreated --
15         THE COURT:  Look, I'm not worried about six months.
16  I mean, really, you know, you're asking for 180 months.  It's
17  a long sentence.
18         It's a simple legal issue, if you want to look at it
19  that way.  I think it poses really complex social policy
20  issues and all kinds of -- I probably couldn't even begin to
21  enumerate all of the policy issues that are posed by a
22  prosecution like this and the issue of what's just punishment.
23         For everything that Ms. Batoff said, I'm sure the
24  Government would have come back and said but that proves our
25  point, he was radicalized on the Internet.  Mr. Mohammed

1  having been radicalized is now a loose cannon.  We have no
2  idea what he'll do, whether his being in prison for six
3  months, five years, ten years, 15 years, will only serve to
4  radicalize him more.  We have no idea what will or will not
5  deter him.  It's really an impossible calculation to try to
6  figure out what is the appropriate sentence here.
7          The conduct is very aggravated.  And so when I look
8  at Mr. Mohammed and I see a young man who seems to be actually
9  a little maybe naive, maybe a little innocent, I think to
10 myself maybe he did get carried away on the Internet.  But I
11 can't disregard what was said.  I can't disregard what was
12 done, and there just isn't a basis in my view for a variance
13 here.
14         So, although I have grave reservations about what I'm
15 doing and what we as a people are doing in order to address
16 this problem of radicalization on the Internet, I don't really
17 think there is a principled basis to do anything other than a
18 180-month sentence.  So that's what it's going to be.
19         So, if you'll stand, Mr. Mohammed, the Court is going
20 to impose sentence now.
21         The Court has considered the statements of the
22 parties, the presentence investigation report containing the
23 advisory guidelines and the statutory factors.  The Court will
24 impose the guideline sentence of 180 months, which is the
25 maximum sentence permitted by statute.

It is further the finding of the Court that the defendant is not able to pay a fine.

It is the judgment of the Court that the defendant, Gufran Ahmed Kauser Mohammed, is committed to the Federal Bureau of Prisons to be imprisoned for a term of 180 months as to Count 1.

Upon release from imprisonment the defendant shall be placed on supervised release for a term of ten years as to Count 1. Within 72 hours of release from the custody of the Federal Bureau of Prisons the defendant shall report in person to the United States Probation office in the district where he is released.

While on supervised release he shall not commit any crimes; he shall be prohibited from possessing a firearm or other dangerous device; shall not possess a controlled substance; shall cooperate in the collection of DNA, and shall comply with the standard conditions of supervised release, including the following special condition: Permissible search and financial disclosure, as stated in Part G of the presentence report.

It is further ordered that the defendant shall immediately pay to the United States an assessment of $100 as to Count 1.

So the total sentence is 180 months' imprisonment, ten years' supervised release, and a $100 assessment.

```
 1              The defendant's right, title and interest to the
 2   property identified in the preliminary order of forfeiture
 3   which was entered by the Court on September 25, 2014, and has
 4   been incorporated by reference herein is hereby forfeited.
 5              And now that sentence has been imposed, does the
 6   defendant or his counsel object to the Court's findings of
 7   fact or to the manner in which sentence was pronounced?
 8              MS. BATOFF:  No, Your Honor.
 9              We would ask for a designation to California.
10              We do object to the sentence, Your Honor.  I
11   apologize.
12              THE COURT:  That's fine.
13              MS. BATOFF:  We do object to the sentence, Your
14   Honor.  And we would like a designation to Victorville,
15   California, if Your Honor would request that.
16              THE COURT:  So recommended.
17              All right.  So, Mr. Mohammed, you may have some
18   rights to take an appeal from the sentence I just imposed.  If
19   you want to take an appeal, the notice of appeal has to be
20   filed within 14 days of entry of the judgment of conviction.
21              Also, if you wish to take an appeal and you cannot
22   afford a lawyer to represent you on appeal or cannot afford
23   the costs of the appeal, the Court will waive the costs and
24   appoint a lawyer upon the filing of a proper motion.
25              What else is there for the Court on this matter?
```

1  MR. DEL TORO: Nothing from the Government, Your
2 Honor.
3  THE COURT: All right. Thank you.
4  MS. BATOFF: Thank you, Your Honor.
5  MR. DEL TORO: Thank you, Judge.
6  *   *   *   *   *   *   *   *   *   *
7  C E R T I F I C A T E
8
9  I certify that the foregoing is a correct transcript
10 from the record of proceedings in the above-entitled matter.