UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 13-20364-CR-UNGARO

UNITED STATES OF AMERICA

v.

MOHAMED HUSSEIN SAID,
    a/k/a "Bill,"
    a/k/a "Billph86,"
    a/k/a "Mohammed Salem bin Abdisheikh,"
    a/k/a "Mohamed Hussein,"
    a/k/a "Abdul-Rahman Abdul Rahim,"
    a/k/a "Tibyan,"

                    Defendant.
_____/

GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION
TO SUPPRESS "INTERNET-CONNECTED DEVICE IDENTIFICATION"
AND ANY WRITTEN OR ORAL STATEMENTS

## I.      INTRODUCTION

Defendant Mohamed Hussein Said has filed a motion to suppress that, as to his first

argument, rests upon no legal basis whatsoever [DE:137].   Said is charged with fundraising and

recruiting for international terrorists affiliated with al-Qa'ida.   Some, but not all, of his activities

occurred over the Internet.   Focusing on the fact that he operated in the virtual world, Said first

seeks suppression of "Internet-connected device identification," a concept utterly unknown in

American jurisprudence.   Overlooking a raft of other evidence, Said claims that, because he was

not arrested at his computer, we cannot be sure it was him.   Said likens the evidence of his Internet

communications to an unreliable witness identification, though no court has ever made that leap.

Online communications are circumstantial evidence not subject to suppression simply because

they do not, on their own, conclusively prove who's behind them.   Like disembodied voices on a

wiretap, emails, instant messages, and other online communication techniques contain clues about who is speaking and thus committing the crimes.   Courts do not equate communication evidence with suggestive pre-trial identification, and for good reason:   Said's extreme assertion—that an online criminal not seen at his keyboard cannot be convicted with Internet evidence—would empty the jails of child pornographers, Internet fraudsters, and terrorism fundraisers and recruiters.

Although Said cannot and has not claimed that any piece of electronic evidence was collected illegally, and thus on its face this part of his motion should be denied, he does also allege that post-arrest statements were coerced.   Here at least Said is within the realm of suppression jurisprudence, though he is wrong on the facts.   The assertion is that FBI agents threatened to prosecute Said's wife though she had committed no crime.   This claim would make Said's statements coerced if it were true.   But the fact is that his wife was involved in the charged crimes and she is an unindicted coconspirator.   Thus, if the agents had threatened Said with his wife's prosecution (and they did not), that would not have been coercive.   Said's attorney overlooks key evidence when she writes, "There was no evidence that Mr. Said's wife was involved in any terrorist related activities" [DE:137 at 12].   Said stated online that his wife knew about his terrorism activities, worked to recruit fighters, and received wire transfers for him.   We identified Said's wife and pulled Western Union records where she had picked up money sent to support terrorism.   This, coincidentally, if not ironically, proves Said was the terrorist talking on the Internet because his wife, identified with absolute certainty, was one of his cash couriers.

## II.    FACTUAL BACKGROUND

### A.  Case Investigation

Said was a citizen and resident of Kenya at all times pertinent to this case.   He is charged with conspiring and attempting to provide material support and resources to three

separately-designated Foreign Terrorist Organizations (FTOs): al-Shabaab, al-Qa'ida, and al-Qa'ida in Iraq/al-Nusrah Front.    These are violations of 18 U.S.C. § 2339B(a)(1).    Said and Gufran Mohammed, who has since pleaded guilty in this case to conspiring with Said and others to provide material support to terrorist organizations, were discovered to be supporting al-Shabaab, the al-Qa'ida affiliate in East Africa, with money and recruits.    The FBI then used various investigative techniques, including the efforts of an online covert employee (OCE), who posed on the Internet as another terrorism supporter, to reveal the full extent of their criminal conduct and their willingness to support a third FTO, al-Qa'ida in Iraq/al-Nusrah Front, which is the al-Qa'ida affiliate in Syria.    The FBI obtained historical Western Union records showing wire transfers from Mohammed to Said for the purpose of supporting al-Shabaab, some of which were retrieved by Said and his wife.    This is proven by identification documents Said and his wife presented at their local Western Union office when they picked up the funds.    The funds were retrieved in Kenya, where Said and his wife resided and where al-Shabaab is known to have some supporters.

The OCE posed as a fundraiser, recruiter, and supplier for al-Qa'ida and al-Qa'ida in Iraq/al-Nusrah Front.    Said's convicted coconspirator, Mohammed, started corresponding with the OCE on the Internet and sent wire transfers to the OCE to support those organizations. Mohammed then introduced the OCE to Said so Said could join those efforts, which he did. Consensual online conversations between the OCE and both Mohammed and Said confirmed that Mohammed had, in the past, sent Said funds for al-Shabaab and that these efforts were ongoing.    These conversations further revealed that Mohammed and Said had recruited individuals to fight for al-Shabaab.    Said also pledged to recruit for the OCE's terrorist groups

and was eager to support other al-Qa'ida affiliates and operations.   Said intended for those recruits to fight on the front lines in Syria or conduct a 9/11-style attack in the United States. Said sent the OCE copies of real identification documents of himself, his wife, and recruits selected for these missions.   Some of those recruits were former al-Shabaab fighters or known terrorist operatives.   Said traveled to Saudi Arabia to pick up money for al-Qa'ida in Iraq/al-Nusrah Front, as he had agreed with the OCE in online communications, and there he was arrested.

### B.  Email Search Warrants

The specific aspects of the investigation recounted in Said's suppression motion are badly mischaracterized and full of inconsistencies and inaccuracies.   One factual contradiction in Said's motion is that he denies he is the person who engaged in online communications with the OCE and Mohammed—but at the same time admits that those same communications "lured" him out of Kenya to his arrest in Saudi Arabia [DE:137 at 3-6].   Said does not and cannot explain how he could have been lured to Saudi Arabia if he was not the person communicating with the OCE in emails, instant messaging, and Join.me sessions.[1]   These were the communications with the OCE in which he arranged to travel to Saudi Arabia.   The reason he cannot explain this inconsistency is that he, in fact, was the person who communicated with the OCE and Mohammed through electronic means.   In fact, the OCE provided Said with a travel itinerary that was found on his

---

[1] Join.me is a web-based screen sharing program that enables a user, called a "host," to share a computer screen with one or more "participants."   The host will go to the Join.me website to get a randomly-generated nine digit number that the host can share with potential participants. The participants then go to the Join.me website and enter the code, which enables them to view the host's computer screen.   The host can share control of the computer with the participants.   The OCE communicated with Mohammed and Said using this method.   Mohammed stated they were "doing this so the kuffar [non-believers] don't read it…its [sic] secure and also the text is not transferred on the network."

person when Said was arrested in Saudi Arabia.

There are additional factual inaccuracies.   For example, Said claims that "[t]here is no eye witness testimony, audio or video evidence connecting Mr. Said as the actual person participating in the incriminating internet conversations or sitting behind a computer" [DE:137 at 2].   This is false because the government has produced an audio recording of Said's telephone call with another FBI undercover arranging his travel to Saudi Arabia.   Yet another factual misstatement is Said's claim that the government lacks evidence of a meeting between an undercover agent and him [DE:137 at 2 fn. 2].   However, Said did agree with the OCE to meet in Saudi Arabia and he actually showed up, which corroborates his identity as the person who was talking online.   Said also falsely claims that "any and all alleged criminal acts evidencing material support to a foreign terrorist organization occurred in Internet chat rooms" [DE:137 at 2].   In fact, the online communications between Said and the OCE occurred through email, instant messaging, and Join.me sessions.   There was no chat room activity with this defendant.

Said's most significant factual misstatement is that "the documentary evidence, including the information obtained in response to the several search warrants, do not link Mr[.] Said to any of these Email addresses" [DE:137 at 4].[2]   In fact, there is overwhelming evidence that Said was communicating online with the OCE and Mohammed.   For example, search warrant returns confirm that Said used his full name to register two email addresses used to communicate with the

---

[2] Said makes much of the fact that, among the voluminous electronic evidence proving his identity, the government has records showing that the IP addresses hosting his online communications resolve to Kenya and "Kenya has over 21 million internet users" [DE:137 at 5 n.3 & 9-10].   However, the IP address evidence merely serves to corroborate other evidence: audio recordings, OCE online recordings, passport and identification information Said sent to the OCE, subscriber records for email addresses, actual content of online communications identifying Said, and his actual travel to Saudi Arabia to meet with the OCE, all after arranging the travel using the some of the same email addresses.

OCE: "mohamed1hs@yahoo.com" and "mohamedhsaid79@yahoo.com." Said also used his actual birth date to register "mohamed1hs@yahoo.com." Said further used the "mohamed1hs@yahoo.com" and "billph86@yahoo.com" email accounts to communicate with the OCE about travel to Saudi Arabia, where his identity was confirmed upon arrest. Said also used "mohamedhsaid79@yahoo.com" to affirm he had distributed money that Mohammed had sent or given him, and to coordinate wire transfers from Mohammed to Said's wife. She picked up these transfers using the same identification card that Said later sent online to the OCE. Most significantly, the search warrant returns include emails in which Said sent to the OCE a copy of his passport and the same Kenyan identification card he used to pick up Mohammed's wire transfers. Said was arrested in possession of the same passport and Kenyan identification card.

Finally, Said was recorded talking to Mohammed in a pre-wired police vehicle after his arrest and upon his arrival in the United States. In this recorded conversation, once the two suspected that the FBI was listening to them, Said claimed that he had taken the money Mohammed had sent for his own use, basically as some sort of fraud. While the context reveals this comment for what it is, a last-ditch attempt to concoct a false exculpatory explanation for their connection and activities, this recording further refutes Said's claim that he was not the person involved in the online communications with Mohammed or the OCE.

At its core, Said's theory that he is not the person involved in the email, instant messages, and Join.me communications with Mohammed and the OCE is at odds with his admission that he was lured by the OCE to travel to Saudi Arabia using some of the same online communication accounts. The "wrong identity" defense is also inconsistent with Said's recorded police car conversation with Mohammed where Said admits to receiving the Western Union transfers from

6

Mohammed and tries out a third theory of defense, that he was "conning" Mohammed out of the money he sent by Western Union.

### C.  Post-Arrest Statements

Said claims that FBI agents "mentally tortured" him by threatening to prosecute his wife if he did not cooperate.   This claim too is false.   No such threats were made.

Moreover, Said's wife is an unindicted coconspirator.   Said's wife received Western Union wire transfers from Mohammed that were intended to support al-Shabaab.   Western Union records confirm this because she used her own identification to pick up the transfers.   Said himself provided the OCE with a copy of his wife's passport, confirming her identity and connection to him.   And Said admitted to the OCE that his wife was involved in his terrorism support activities.

### III.   LEGAL ANALYSIS

### A.   Evidence Obtained Pursuant to Judicially-Authorized Search Warrants Should Not Be Suppressed.

Said argues in a footnote that evidence derived from the search warrants executed in this case should be suppressed [DE:137 at 1 n.1].   Said has not argued, and indeed he cannot show, that any search warrant issued in this case lacked probable cause.   A motion to suppress must, in every critical respect, be sufficiently definite, specific, detailed, and non-conjectural to enable the court to conclude that a substantial claim is presented.   United States v. Richardson, 764 F.2d 1514, 1527 (11th Cir. 1985).   The motion must allege facts which, if proven, would provide a basis for relief.   Id.   A court need not act upon general or conclusory assertions founded on mere suspicion or conjecture, and the court has discretion in determining the need for a hearing.   Id.

7

The Fourth Amendment merely requires the magistrate issuing a search warrant make a practical, common sense decision on whether, given all the circumstances set forth in the affidavit, there is a fair probability that evidence of a crime will be found at a particular place.   Illinois v. Gates, 462 U.S. 213 (1983).   Courts reviewing the legitimacy of search warrants should not interpret their affidavits in a hyper-technical manner, but rather a realistic and common sense approach should be employed.   United States v. Miller, 24 F.3d 1357, 1361 (11th Cir. 1994).   The nexus between the objects to be seized and the premises searched can be established from the particular circumstances involved and need not rest on direct observation.   United States v. Jenkins, 901 F.2d 1075 (11th Cir. 1990); United States v. Lockett, 674 F.2d 843 (11th Cir. 1982).

Said's only claim for suppression is that the one warrant affidavit he attached as Exhibit A to his motion fails to establish that he was the user of the email accounts to be searched.   Search warrants need not identify the user of the premises to be searched because one of the purposes of the warrant may be to determine the identity of the culprit of a crime.   See Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 307 (1967) (government may demonstrate probable cause and lawfully search for stolen property though true owner is unknown or unavailable to request and authorize government to assert his interest); Zurcher v. Stanford Daily, et al., 436 U.S. 547, 555 (1978) (citing United States v. Khan, 415 U.S. 143, 155 n. 15 (1974)) ("Search warrants are not directed at persons: they authorize the search of 'place[s]' and the seizure of 'things,' and as a constitutional matter they need not even name the person from whom the things will be seized.").

In the instant case, Said has failed to allege, much less prove, that any of the search warrants that were judicially authorized in this case lacked probable cause.   Therefore, no Fourth Amendment violation exists.

**B.** **There Is Nothing Impermissibly Suggestive About the Evidence the Government Has Used to Establish Said's Identity.**

When Said asserts that "any evidence of pre-trial identification that relies on email addresses or IP addresses" to establish the identity of the user of those communications facilities should be suppressed, he reaches too far. Said conflates the Fourth Amendment's reasonable search and seizure requirements with the Fifth Amendment's due process prohibition of suggestive pre-trial identification. In doing so, Said mistakenly relies on case law prohibiting out-of-court physical identification procedures that are unduly suggestive.[3] Said is comparing apples and oranges, or more analogously, apples and giraffes. The government has conducted no out-of-court physical identification procedures involving Said. Therefore, the case law that Said cites is inapposite and there is no show up or line up to suppress. Nor is there any evidence of constitutionally-impermissible suggestiveness in the processes of serving grand jury subpoenas for records or obtaining judicially-authorized search warrants.

Said's identity will be proved at trial using, among other things, a combination of recorded and transcribed communications between Said and the OCE; physical evidence such as passports, identification cards, and other documents obtained and seized from Said; subpoenaed electronic records; and records obtained pursuant to judicially-authorized search warrants based on probable cause. Said's motion to suppress seeks to short-circuit the trial process by arguing the merits of an ultimate issue, which is for the trier of fact to decide, namely, the identity of the culprit.[4] There

---

[3] Said cites Neil v. Biggers, 409 U.S. 188, 198 (1972), which dealt with an unduly-suggestive physical identification procedure, something that was not employed in the instant case. In fact, there was no pre-trial identification procedure at all, making Biggers completely inapposite.

[4] Said's novel, if creative, legal argument is that the voluminous evidence of identity should not be introduced because it does not prove his identity. This argument is circular and turns the trial process and the rules of evidence on their head.

is no legal basis for such suppression, which is why Said cannot cite a single case on point in support of his motion.

Instead, Said cites to a civil court decision, Malibu Media v. John Doe, United States District Court for the Southern District of Florida, Case No. 14-60259-CIV-UU, dismissing a copyright infringement case for lack of venue based solely on IP address information. That evidence was proffered to show the geographic location of electronic devices allegedly used in the copyright infringement. Of course, the Malibu Media case is completely distinguishable. Here, the government is not suing for copyright infringement and Said's identification will not be proved merely with IP address records. And unlike the Malibu Media copyright plaintiff who had to sue an unknown "John Doe," the government here will prove beyond a reasonable doubt that Said is the one guilty of the charged terrorism support offenses. Said's identity will be established beyond a reasonable doubt using all the types of evidence gathered in this case.[5]

Whether the government's evidence proves the ultimate issue of identity is not a pre-trial suppression matter. It is an issue for the court and the jury at trial. The district court must decide admissibility of the identification evidence at trial, a threshold question merely requiring relevance. Fed. R. Evid. 401, 402; United States v. Mathews, 431 F.3d 1296, 1309 (11th Cir. 2005) (admissible relevant evidence bears "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"). Said can dispute the significance of the identity evidence offered at trial,

_____

[5] Again, a formidable and convincing array of evidence places Said at the center of the charged material support offenses: recorded online communications between Said and the OCE; email subscriber and connection records; passport and identification documents provided directly by Said to the OCE; wire transfer records containing the same Kenyan identification document that Said provided to the OCE and that was later seized upon his arrest; and evidence that Said used the email addresses and online communications to arrange for travel to Saudi Arabia—travel in which he actually engaged, thereby definitively proving his identity.

but that will go to the weight of the evidence, not its admissibility.  Cf. United States v. Robertson, 897 F.2d 1092 (11th Cir. 1990) (gaps in chain of custody affect only weight of evidence and not its admissibility).  Ultimately, the jury will decide whether the audio and electronic recordings, passport and identification evidence, electronic records, and other circumstantial evidence sufficiently prove Said's identity.  See United States v. Stewart, 429 F.2d 15 (8th Cir. 1970) (identity is factual question for jury despite record evidence refuting government's evidence of identity).

Moreover, courts have long held that circumstantial evidence can be used to prove the identity of a defendant.   For example, the Eighth Circuit held in an analogous case that identity of the person with whom a telephone conversation is alleged to have been had may be established by circumstantial evidence.  Cwach v. United States, 212 F.2d 520, 525 (8th Cir. 1954).  In Cwach, identification of the defendant's voice was held not to be a prerequisite to admission of a telephone conversation and telephone toll records where circumstantial evidence, including documentary evidence and testimony, subsequently established the defendant's identity.  Id.  See also Grogan v. United States of America, 394 F.2d 287, 291 (8th Cir. 1967) (same), cert. denied, 393 U.S. 830 (1968).  Similarly, in Palos v. United States, 416 F.2d 438, 440 (5th Cir. 1969), the Fifth Circuit held that circumstantial evidence was sufficient to make out a prima facie case from which the jury could have concluded that the defendant was a party to a monitored telephone conversation, though a government agent could not identify the voice but the defendant identified himself by his nickname on the call.[6]

Consistent with the Eight and Fifth Circuits, the Tenth Circuit held in United States v. Cox,

---

[6] Decisions of the former Fifth Circuit rendered before September 30, 1981, are binding in the Eleventh Circuit.  Bonner v. City of Pritchard, 661 F.2d 1206 (11th Cir. 1981) (en banc).

449 F.2d 679, 689 (10th Cir. 1971), that a tape recording of a telephone conversation was admissible, over objection that the monitoring agents did not have the requisite knowledge to identify the voices, where the speaker, alleged to be a defendant, identified himself by first name and where the telephone number called belonged to the residence of that defendant. In United States v. Cook, 794 F.2d 561, 567 (10th Cir. 1986), the Tenth Circuit similarly held that circumstantial evidence, such as name references during the conversations and pen register records of the numbers called, provided a sufficient voice identification foundation. Once that threshold was met, it was for the jury to decide the question of identity. Id.

The instant case is legally indistinguishable from Cwach, Palos, Grogan, Cox, and Cook. Like the defendant in each of these cases, Said will be identified through circumstantial evidence proving that he was the person who participated in emails, instant messages, and Join.me sessions with the OCE and Mohammed. Unlike the cases cited above, the evidence of identification here further includes evidence that Said sent to the OCE copies of his passport and Kenyan identification card, which were seized from him upon his arrest in Saudi Arabia and which he had earlier used to claim Western Union wire transfers from Mohammed. And to prove conclusively Said's identity, the government will present evidence that Said in fact traveled to Saudi Arabia after making arrangements to travel with the OCE through online communications using email accounts attributed to him. Therefore, Said's meritless motion should be denied without a hearing.[7]

---

[7] Furthermore, Said lacks standing to challenge any search warrant yielding evidence of communications on the subject email accounts. He disputes the government's assertion that the electronic evidence identifies him as the author of the emails and chats [DE:137 at 4]. Because Said disputes that he is the user of the email and IP addresses at issue, he disavows his own expectation of privacy in the facilities that were searched, and therefore lacks standing to challenge any search warrant yielding evidence of those communications. Where a defendant fails to allege

**C.** **Said's Fifth Amendment Rights Were Not Violated As a Result of an Involuntary Confession.**

Said has not provided any evidence, affidavit, or other sworn statement in support of his allegations of mental torture or coercive threats.   Moreover, he would not be able to provide any such evidence or statement—at least one that reflects the truth—because his allegations are false. The FBI agents did inform Said that they knew that his wife was involved in the criminal conspiracy, but they did not threaten to prosecute her.

Moreover, at the time of Said's custodial interview, the FBI had probable cause to believe that his wife had committed a crime—multiple crimes, in fact.   "A threat to arrest someone for whom the police have probable cause to arrest does not constitute coercion."   United States v. Johnson, 379 Fed. Appx. 964, 968 n.5 (11th Cir. 2010) (citing Thompson v. Haley, 255 F.3d 1292, 1297 (11th Cir. 2001)).[8]   In the instant case, probable cause existed at the time of Said's post-arrest statements to prove that his wife, Selma Ahmic, was an unindicted co-conspirator in the material support conspiracy.

---

facts that, if proved, would establish his standing to contest a search, the court may deny the motion without a hearing.  United States v. Cooper, 203 F.3d 1279, 1284-85 (11th Cir. 2000) (defendants failed to alleged sufficient facts to prove standing to challenge search of hotel room because they claimed room was "theirs" without alleging that they were registered in hotel, paid for room, or had any other specific indicia of reasonable expectation of privacy).  In this case, Said has alleged facts that actually refute his identity as the owner of the email accounts and IP addresses, all of which yielded the evidence he seeks to suppress [DE:137 at 2-4].  Thus, Said himself has established his lack of standing because he claims that the email and IP addresses belong to other individuals.

[8] Said cites Martin v. Kemp, 760 F.2d 1244, 1247-48 (11th Cir. 1985), for the proposition that a threat to prosecute a family member makes a post-arrest statement involuntary.  Kemp did not involve suppression of an involuntary confession.  The only issue there was whether the defendant could withdraw a guilty plea based on involuntariness because the police threatened to prosecute his wife if he did not confess and cooperate.  Id. at 1246-48.  The Kemp court ruled that the defendant bears a heavy burden to prove that the government "did not observe a 'high standard of good faith' based upon probable cause to believe that the third party had committed a crime."  Id. at 1248.  The Kemp rationale was extended to claims of involuntary confession in Haley, 255 F.3d at 1296-97.

13

The following facts provided probable cause to believe that Said, Ahmic, and Mohammed conspired together to provide material support to al-Shabaab:

1.      Said informed the OCE in January 2013 that Mohammed had previously used a person known as "Udairaj" and someone with an Arab name to send money to him through Western Union.

2.      A physical search of Mohammed's iPhone when he entered the United States at Los Angeles International Airport (LAX) in November 2011 revealed that "Udairaj Maurya" was listed as one of Mohammed's contacts.

3.      A physical search of a computer belonging to Mohammed revealed that he sent the name "Udairaj Maurya" and wire transfer number "Western No 6986081828" to "mohamedhsaid79" on July 13, 2011, and the next day asked if the "mother of ur kid" got "that thing."

4.      Grand jury subpoena returns from Western Union show the following transfers from Udairaj Maurya to Said's wife, Selma Ahmic:

| Sent Date | Sender's Name | Sent Amount US$ | Control Number | Sender's Phone | Payee's Name |
|---|---|---|---|---|---|
| 6/12/2011 | UDAIRAJ MAURYA | 799.97 | 0756732927 | 0591506797 | SELMA AHMIC |
| 7/13/2011 | UDAIRAJ MAURYA | 746.60 | 6986081828 | 966591506797 | SELMA AHMIC |
| 8/28/2011 | UDAIRAJ MAURYA | 1926.35 | 8627541252 | 966591506797 | SELMA AHMIC |
| 9/13/2011 | UDAIRAJ MAURYA | 1013.09 | 0608038095 | 966591506797 | SELMA AHMIC |

14

5.      The personal identification number on these Western Union transfers matches the number on a Bosnian identification card that Said sent to the OCE in October 2012, and which Said confirmed was his wife's identification.

6.      The LAX search of Mohammed's iPhone also revealed telephone number "966566100347" as a contact number for a person listed as "Hamid" in the iPhone.

7.      Grand jury subpoena returns from Western Union show that "Abdulhameed Mohammad Borae" provided this same phone number, 966566100347, to Western Union on wire transfers sent to Said's wife, Selma Ahmic.

8.      Grand Jury subpoena returns from Western Union further show the following transfers from "Abdulhameed Mohammad Borae" (variant "Boraei") to Said and Ahmic:

| Sent Date | Sender's Name | Sent Amount US$ | Control Number | Sender's Phone | Payee's Name |
|---|---|---|---|---|---|
| 8/10/2011 | **ABDELHAMID MOHD HUSSEIN BORAEI** | **2,941.09** | 3607880456 | 966566100347 | **SELMA AHMIC** |
| 7/9/2011 | **ABDULHAMEED MOHAMMAD BORAE** | **2,182.55** | 7325795287 | 966566100347 | **SELMA AHMIC** |
| 6/7/2011 | **ABDULHAMEED MOHAMMED BORAE** | **2062.55** | 1245841752 | | **MOHAMED HUSSEIN** |

9.      The "Mohamed Hussein" who received the Western Union transfer on June 7, 2011, is, in fact, Said, as the identification number on the transfer matches his Kenyan identification card.   This was also the card Said sent to the OCE in October 2012.

Additionally, Said had this identification card in his possession when the FBI arrested him in Saudi Arabia, and the card was confirmed to have Said's photograph and name on it.

10.     Said informed the OCE in September 2012 that Mohammed used to send money "through" him and his wife.

11.     Said informed the OCE in August 2013 that his wife knows all about his support for al-Qa'ida in Iraq/al-Nusrah Front, that she is fine with it, and that they are working together on the recruitment of fighters from Bosnia, her home country.

Based on the substantial evidence of Ahmic's participation in the material support conspiracy, the FBI agents had probable cause to prove her complicity.  Accordingly, Said has failed to meet his burden to show that he was coerced into making an involuntary confession.

## IV.     CONCLUSION

Said has failed to cite any law or allege any facts to prove a constitutional violation, especially as to the Internet communications.  A hearing on that issue would devolve into exactly what Said intends it to be, a fishing expedition into how the government will prove its case.  As mentioned above, the Eleventh Circuit has stated:

> A motion to suppress must in every critical respect be sufficiently definite, specific, detailed, and non-conjectural to enable the court to conclude that a substantial claim is presented.  In short, the motion must allege facts which, if proven, would provide a basis for relief.  <u>A court need not act upon general or conclusory assertions founded on mere suspicion or conjecture, and the court has discretion in determining the need for a hearing</u>.

<u>Richardson</u>, 764 F.2d at 1527 (emphasis added).  Said has offered no basis on which any piece of evidence was obtained illegally.  He has not even specified exactly which verbal or written statements should be suppressed.  Accordingly, the government respectfully requests that this Court deny Said's motion to suppress without a hearing.

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY


By:   /s/ *Ricardo A. Del Toro*
      Ricardo A. Del Toro
      Fla. Bar No. 597585
      Brian K. Frazier
      Court No. A5500476
      Assistant United States Attorneys
      99 N.E. 4th Street
      Miami, Florida 33132
      Tel: (305) 961-9000
      Fax: (305) 536-4675

      Jolie F. Zimmerman
      Trial Attorney, Counterterrorism Section
      United States Department of Justice
      950 Pennsylvania Avenue, N.W.
      Washington, DC 20530
      Tel: (202) 514-1453
      Fax: (202) 514-8714


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 5, 2015, I electronically filed the foregoing with

the Clerk of the Court using CM/ECF.


/s/ *Ricardo A. Del Toro*
Ricardo A. Del Toro
Assistant U.S. Attorney

17