**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 13-20364-CR-UNGARO**

**UNITED STATES OF AMERICA**

**v.**

**MOHAMED HUSSEIN SAID,**

    **Defendant.**

_____/

## SENTENCING MEMORANDUM

The defendant, **MOHAMED SAID**, through undersigned counsel and pursuant to the provisions of Federal Rule of Criminal Procedure 32, respectfully files this Sentencing Memorandum in support of a non-guidelines sentence that is "sufficient, but not greater than necessary to comply with the purposes" of Title 18, United States Code, Section 3553. The sentencing hearing is currently scheduled for Friday, August 28, 2015.

This memorandum is submitted to aid the Court in crafting an appropriate sentence for Mr. Said, in light of the Factual Proffer [D.E.], Plea Agreement [D.E. 232], and the factors set forth in Section 3553. After consideration all those factors, Mr. Said respectfully requests that the Court sentence him to eight years incarceration, followed by voluntary removal to Kenya.

### I. INTRODUCTION

Mr. Said is twenty-seven years old. He is a citizen of the Republic of Kenya, born in the city of Mombassa. In 2009, he moved to Nairobi, Kenya to work as an engineer-draftsman for his uncle. His wife and two young daughters, along with his entire family, still live in Kenya. Prior to his forcible removal to the United States from the Kingdom of Saudi Arabia in August 2013, Mr. Said had never traveled or attempted to travel the United States. Mr. Said has no acquaintances in the

United States and he has never knowingly communicated with any person in the United States, its territories, or possessions.   Indeed, this entire case was predicated upon Internet communications, that to the best of Mr. Said's knowledge occurred entirely outside the United States.

In May 2013, a grand jury sitting in the Southern District of Florida returned a fifteen count indictment charging Mr. Said and co-defendant Ahmed Kauser Gufran Mohamed, a United States Citizen, with: (a) conspiring to provide material support to a foreign terrorist organization ("FTO") in violation of 18 U.S.C. § 2339B(a)(1)(Count 1); attempting to provide material support to al-Shabaab (Counts 2-8); and with attempting to provide material support to al-Qa'ida (Counts 9-15). On May 28, 2015, Mr. Said pled guilty to Count 1 of the Indictment, providing material support or resources ($11,672) to foreign terrorist organizations.   In addition to admitting his guilt, Mr. Said has accepted responsibility for his actions.

## II.  LEGAL MEMORANDUM

It has been ten years since the Supreme Court successfully wrestled away from the government the sentencing prerogatives that had, until the Sentencing Reform Act of 1984, been the sole domain of the district courts.  *See United States v. Booker*, 543 U.S. 220 (2005).   In *Booker*, the Supreme Court held that the Federal Sentencing Guidelines, as interpreted in *Blakely v. Washington*, 542 U.S. 296 (2004), violate the Sixth Amendment and are no longer mandatory.   As the Guidelines are now advisory, they are simply one factor among several that a sentencing court must consider in fashioning a sentence that is "sufficient but not greater than necessary" to achieve the goals of sentencing set forth in 18 U.S.C. § 3553(a)(2).

After *Booker*, sentencing requires two steps.   First, the district court must consult the

guidelines and correctly calculate the range provided, including any departures from that range. *United States v. Crawford*, 407 F3d 1174, 1178 (11th Cir. 2005).  Second, the court must consider the seven factors outlined in Section 3553(a).  *United States v. Talley*, 431 F3d 784, 785 (11th Cir. 2005)(Eleventh Circuit required district courts to consider the §3553(a) factors in addition to the advisory guideline range).    As a result of this *Booker* mandated two-step analysis, a court is no longer required to impose a sentence within the guideline range, even where there is no basis to depart.  Under Section 3553(a), the key requirement is that the sentence in each case be ***"sufficient, but not greater than necessary."*** (emphasis added).

### A.    SENTENCING GUIDELINE RANGE

The first step under the *Booker* analysis requires this Court to correctly calculate the guideline range.  As a result of the statutorily authorized maximum sentence of fifteen years, the PSI calculates Mr. Said's guideline term of imprisonment at 180 months.  *See* U.S.S.G. § 5G1.1(a); PSI at ¶ 71. Although Mr. Said objected to some portions of the PSI in his confidential submission to the Probation Officer, those objections have no impact on the recommended sentence and only address factual or biographical errors.

### B.    SECTION 3553(a) SENTENCING FACTORS

The second step in the *Booker* analysis, requires the court to consider the factors delineated in Section 3553(a) in fashioning a reasonable sentence.  Although the § 3553(a) factors have been memorized by most who come in contact with them, they are worth repeating:

(1)    the nature and circumstance of the offense and the history of the defendant;

(2)    the need for the sentence imposed -

(3)     the kinds of sentences available;

(4)     the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . .;

(5)     any pertinent [Guidelines] policy statement . . . .;

(6)     the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)     the need to provide restitution to any victims of the offense.

U.S.C. § 3553(a).

This analysis allows the sentencing court to consider arguments and evidence that the guidelines do not consider and impose a sentence different from that prescribed by the guidelines that would be appropriate in a particular case. *See Pepper v. United States*, 131 S.Ct. 1229, 1247 (2011). In *Pepper*, the Supreme Court emphasized the need for individualized sentencing based not only on the crime but on the defendant. *Id.* In Mr. Said's case, the Section 3553(a) factors favor an eight year sentence, followed by voluntary removal from the United States..

## 1.     The Nature and Circumstances of the Offense

While the nature of Mr. Said's offense - providing material support to a foreign terrorist organization - is no doubt serious; the circumstances surrounding the offense mitigate the recommended guideline sentence and support a downward variance. First, Mr. Said, a Kenyan national, never took part in any specific plot against the United States. As outlined in the Factual Proffer, Mr. Said assisted in the movement of funds ($11,672) and recruitment for al-Shabaab in Kenya. There is no evidence that Mr. Said's actions were specifically intended to target the United States for attack. On the contrary, his actions demonstrate that Mr. Said's motivation was to assist al-Shabaab in Africa.

Second, Mr. Said is a foreign national whose acts were limited to Africa.  Unlike the co-defendant, Mohamed, who is a United States citizen, Mr. Said had never traveled to the United States and had no intention to do so.  Indeed, Mr. Said knows absolutely no one in the United States; his entire family and friends reside in Kenya.

Third, Mr. Said, who prior to this case had never even been arrested,   did not participate in any military training or  seek to fight with al-Shabaab.  Mr. Said's role was limited to moving  funds ($11,642)   provided  by co-defendant Mohamed through Western Union and locating potential recruits in Africa.   All coordination for Mr. Said's participation in this case, occurred  through Internet communications.   Accordingly, while Mr. Said does not deny his participation, it is important to note that most of the communications were actually with an online  covert  employee ("OCE") of the United States.  The OCE directed  much of the conversation with Mr. Said and encouraged his participation in the conspiracy.

Simply put, Mr. Said's conduct was limited to Africa and never directed at the United States. His entire life was spent between Mombassa - Nairobi and overshadowed by the political, economic, and social struggles within Kenya.  He had no greater aims, and certainly none that encompassed the United States of America.

### 2.    The Need to Avoid Unwarranted Sentencing Disparities

When it comes to terrorism offenses, the Sentencing Guidelines are blunt and many times an unreasonable instrument.  In nearly every case, the maximum sentence is far exceeded because of the adjustments required (e.g., the 12 point terrorism enhancement, and the shift to Criminal History Category IV).  As a result, the Sentencing Guidelines do not properly distinguish among the many different offenses that technically fall within the statutory definitions of "involving" or "intending

to promote" a federal crime of terrorism.    To the contrary, by treating all cases equally, the guidelines range cannot help but overstate the seriousness of the conduct of individuals like Mr. Said, compared to others who specifically target the United States for attack.    Likewise, the enhancements indiscriminately group all individuals convicted of eligible offenses as if they all have the same ideological or criminal history.

For this reason, district courts throughout the country have shown greater discretion in imposing mitigated sentences and sentences far below the advisory guideline range when warranted. Indeed, as demonstrated below, mitigated sentences have been imposed in cases where the conduct committed was much more serious, severe, and threatening than the conduct of Mr. Said in this case.

### a.   Mohamed Abdullah Warsame - 92 Months Imprisonment

In *United States v. Warsame*, 651 F. Supp.2d 978 (D. Minn. 2009), the defendant pled to a single count of conspiring to provide material support to al-Qa'ida – a designated foreign terrorist organization – and received a sentence of ninety-two (92) months imprisonment. *Id.* at 979.   In *Warsame*, the defendant, a United States citizen, traveled to Afghanistan in early 2000 and attended an al-Qa'ida training camp. At the conclusion of the first training camp, Mr. Warsame joined other fellow trainees and traveled to Kandahar, Afghanistan, where they sought admittance to an al-Qa'ida training camp led by Usama bin Laden. There, the defendant received military training, and met with, and attended lectures by, Usama bin Laden. The defendant also provided his services to al-Qa'ida as a security guard and by teaching English at a medical clinic for al-Qa'ida associates.  *Id.* at 980.

Upon returning to his family in Minneapolis, Minnesota (the return trip having been financed by al-Qa'ida), Mr. Warsame solicited money from others and wired the funds to a bank account in Pakistan at the specific request of a training camp commander known by the defendant in

Afghanistan. In doing so, Mr. Warsame knew that the funds would be used to support members of al-Qa'ida. *Id.*

In considering what kind of sentence to impose on Mr. Warsame, the district court "carefully considered the sentences imposed in dozens of other terror-related cases in the United States in the last eight years." *Id.* at 982. Specifically, the district court found guidance in the cases of Salim Hamdan, often described as the personal driver of Usama bin Laden (sentenced to sixty-six (66) months by a military jury), and the case of the "Lackawanna Six," referring to *United States v. Goba*, 2040 F.Supp.2d 242 (W.D.N.Y. 2003) (sentences ranging from 84 to 120 months). *Warsame*, 651 F.Supp.2d at 982.

> While this Court has given its utmost consideration to all of the public and non-public information in this case – including all of the information that in any way implicates the national security of the United States – it simply finds nothing that adequately demonstrates that Warsame was part of a specific plot against the United States, and very little that suggests he was especially useful to al-Qa'ida, either during his training in the Middle East or upon his return to North America.
>
> In short, while participation of any sort in a terrorist enterprise is a deplorable step, and is appropriately dealt with harshly under federal law, the nature of that participation will of course vary, and not every participant will merit equal punishment. That is especially important to bear in mind here, in a case involving no concrete evidence of any substantial involvement in al-Qa'ida's operations or of specific violent actions . . . .

*Id.* at 981-982.

The district court, taking into consideration Mr. Warsame's limited role along the spectrum of material support cases, analyzing other cases and sentences with similar type conduct, and acknowledging that the government itself was recommending a variance from the statutory maximum of 180 months down to 150 months, ultimately imposed a variance and sentenced Mr.

Warsame to 92 months – roughly half of the guideline sentence.

The nature of Mr. Said's conduct in this case is strikingly different than the defendant's conduct in *Warsame*. First, Mr. Said, unlike his co-defendant Mohamed and the defendant in *Warsame*, is not a United States citizen and had never even traveled to the United States prior to this case. Second, Mr. Said never sought to receive military training at a training camp and, aside from moving funds ($11,762) and locating potential recruits in Africa, he never provided other services to al-Shabaab. Moreover, Mr. Said, unlike Warsame, never communicated with anyone in leadership positions of these groups from the United States or in Africa. The evidence provided demonstrates that aside from the co-defendant Mohamed, Mr. Said's communications were primarily limited to undercover United States law enforcement operatives.

### b. Salim Ahmed Hamdan - 66 Months Imprisonment.

Salim Ahmed Hamdan was accused of acting as Usama bin Laden's driver. In addition, he was charged with arranging for the transportation of, and then actually transporting, weapons used by al-Qa'ida. Finally, he attended al-Qa'ida training camps, and received weapons training. *See Hamdan v. Rumsfeld*, 548 U.S. 557, 570 (2006).

As stated in relevant part in the original charging document:

a. In 1996, Hamdan met Usama bin Laden in Qandahar, Afghanistan and ultimately became a bodyguard and personal driver for Usama bin Laden. Hamdan served in this capacity until his capture in November of 2001. Based on his contact with Usama bin Laden and members or associates of al Qa'ida during this period, Hamdan believed that Usama bin Laden and his associates were involved in the attacks on the U.S. Embassies in Kenya and Tanzania in August 1998, the attack on the USS Cole in October 2000, and the attacks on the United States on September 11, 2001.

b. From 1996 through 2001, Hamdan:

1.  delivered weapons, ammunition or other supplies to al Qa'ida members and associates;

2.  picked up weapons at Taliban warehouses for al Qa'ida use and delivered them directly to Saif al Adel, the head of al Qa'ida's security committee, in Qandahar, Afghanistan;

3.  purchased or ensured that Toyota Hi Lux trucks were available for use by the Usama bin Laden bodyguard unit tasked with protecting and providing physical security for Usama bin Laden; and,

4.  served as a driver for Usama bin Laden and other high ranking al Qa'ida members and associates. At the time of the al Qa'ida sponsored attacks on the U.S. Embassies in Tanzania and Kenya in August of 1998, and the attacks on the United States on September 11, 2001, Hamdan served as a driver in a convoy of three to nine vehicles in which Usama bin Laden and others were transported to various areas in Afghanistan. Such convoys were utilized to ensure the safety of Usama bin Laden and the others. Bodyguards in these convoys were armed with Kalishnikov rifles, rocket propelled grenades, hand-held radios and handguns.

c.  On diverse occasions between 1996 and November 2001, Hamdan drove or accompanied Usama bin Laden to various al Qa'ida-sponsored training camps, press conferences, or lectures. During these trips, Usama bin Laden would give speeches in which he would encourage others to conduct "martyr missions" (meaning an attack wherein one would kill himself as well as the targets of the attack) against the Americans, to engage in war against the Americans, and to drive the "infidels" out of the Arabian Peninsula.

d.  Between 1996 and November 2001, Hamdan, on diverse occasions received training on rifles, handguns and machine guns at the al Qa'ida- sponsored al Farouq camp in Afghanistan.

*Hamdan* at 570, 126 S.Ct. at 2761.

In November 2001, during hostilities between the United States and the Taliban, Hamdan was captured by militia forces and turned over to the United States military. In June 2002, he  was

transported to Guantanamo Bay.   *Hamdan* at 566, 126 S.Ct. 2749, 2759 (2006).  A year later, President Bush declared Hamdan eligible for trial by military commission. *Id.* Hamdan challenged prosecution by military commission, which ultimately resulted in the Supreme Court's finding that the military commission lacked power to proceed in the prosecution of Hamdan.   After the Supreme Court delivered its opinion, Congress passed the Military Commissions Act of 2006. In the interim, Hamdan tried to work out a deal for a ten-year term of imprisonment, but that offer was rejected by the prosecution.  The charges against Hamdan were expanded from mere conspiracy to include a charge of providing support for terrorism, and on December 21, 2007, the Combatant Status Review Tribunal ruled that Hamdan was an "illegal enemy combatant," who would be tried by a military commission.

Hamdan's trial began on July 21, 2008. During trial, the prosecution attempted to portray Hamdan as a hardened al Qa'ida warrior. The jury of six military officers convicted him of supporting al Qa'ida by driving and guarding bin Laden and ferrying weapons for the terror group. At the time of sentencing, prosecutors sought a 30-year term of imprisonment. The military jury, unconvinced that Hamdan was anything more than a low-level al Qa'ida figure, returned a sentence of 66 months. *Id.*

Mr. Said's conduct in this case falls way below the actions that Mr. Hamdan took in support of al Qa'ida from 1996 through 2001. Unlike Hamdan, there is no evidence that Mr. Said was ever tasked with carrying out sensitive activities such as delivering weapons, purchasing equipment, or being around high-ranking operatives planning specific attacks. Indeed, the facts of this case, demonstrate that Mr. Said was solely used to move limited funds to al-Shabaab and as a potential source for other recruits.  Mr. Said's role when compared to that of Hamdan, was diminutive, and

the sentence imposed there militates in favor of a downward variance in this case.

### c. The "Lackawanna Six" - 84 to 120 Months Imprisonment

In this case, six defendants were accused of traveling from the United States to Pakistan, and then to an al Qa'ida training camp in Afghanistan. *See United States v. Goba*, 240 F.Supp.2d 242, 244-45 (W.D.N.Y. 2003). The defendants received firearms and tactical training, heard lectures justifying martyrdom, and attended a speech delivered by Usama bin Laden looking ahead to a fight against Americans. *Id.* at 244. The defendants then returned to the United States, and in searches of their apartments following their arrests, authorities discovered a gun, a document justifying suicide as a form of martyrdom, and an email allegedly cryptically referring to a future terror operation. *Id.* at 256. The defendants ultimately received (some after cooperating with the government) sentences ranging from 84 to 120 months.

Contrary to the defendants in the *Goba* case, in this case, Mr. Said did not live in the United States and received no training and had no contact with high-ranking members of terrorist organizations. Moreover, there is no evidence that Mr. Said possessed any weapons or participated in any violent acts. More importantly, there is no evidence in this case that Mr. Said assisted in planning or carrying out specific acts of violence against the United States. In looking at the range of sentences imposed in *Goba*, Mr. Said's request for an eight year sentence is reasonable.

### d. Richard David Hupper - 46 Months Imprisonment

The facts in *United States v. Hupper*, Case No. 08-CR-20410-PH, prosecuted in the Southern District of Florida six years ago, are somewhat similar to Mr. Said's actions in this case. Mr. Hupper pled guilty to a one-count information, charging him with attempting to provide material support and resources ($20,000) to Hamas over a two-year period of time. *United States v. Hupper*, 08-CR-

20410-P.H., at D.E. 1 and D.E. 14.

Mr. Hupper became involved with a group known as the International Solidarity Movement ("ISM") when he traveled to the Middle East to aid Palestinians, whom he believed were not receiving fair treatment by the Israeli government or the press. While overseas, Mr. Hupper devoted time and effort to the plight of the Palestinian people and also contributed funds to help them. (D.E. 14; 2). Mr. Hupper was aware, however, that the funds he contributed, including a donation of approximately $20,000, was going directly to Hamas, the outlawed party of the Palestinians and a U.S. designated foreign terrorist organization. *Id.*

As a result of his activities in Palestine, Mr. Hupper's Israeli visa was revoked and he was required to leave the country. *Id.* Upon his return to the United States, he attempted to obtain a false passport so that he could return to Palestine. *Id.* Mr. Hupper was sentenced to two years on the false passport charges. While serving his sentence on the false passport charges, the United States charged Mr. Hupper with attempting to provide material support to Hamas. (D.E. 1).

Mr. Hupper pled guilty to the information. At sentencing, he faced a statutory maximum of 15 years – 180 months – in prison. The court imposed a forty-six (46) month sentence – less than a third of the guideline sentence of 180 months. (D.E. 18). This sentence was to be served consecutively to the two-year sentence Mr. Hupper received on the passport fraud charges. Given that Mr. Hupper received, in total, a seventy-month sentence for his involvement with Hamas, the fact that he is a United States citizen and the amount of funds involved, Mr. Said's request for a variance in this case is reasonable.

### e. Hor I. Akl and Amera A. Akl - 75/40 Months Imprisonment

In this case, Hor and Amera Akl, a couple from Toledo, Ohio, pled guilty to conspiring to

provide material support to Hezbollah. *See, generally, United States v. Akl, et. al*, Case No. 3:10-CR-00251-JGC (N.D. Ohio 2003). Over the course of a year, Hor and Amera Akl planned to send up to $1 million to Hezbollah, the Lebanese group designated by the U.S. as a foreign terrorist organization. The Akls met multiple times between August 2009 and June 2010 with a confidential source who was working on behalf of the FBI. (D.E. 74). During those meetings, the Akls discussed ways to secretly send money to Hezbollah leaders in Lebanon. In a meeting on August 30, 2009, Amera Akl told the confidential source that she dreamed of dressing like Hezbollah, carrying a gun, and dying as a martyr. (D.E. 74; 13). In another meeting on September 10, 2009, Hor Akl, in the presence of his wife, told the confidential source that he understood the money was being transported to "terrorists." He also stated he understood the funds would be used to target Israel. (D.E. 74; 14).

On March 1, 2010, Hor Akl traveled to Lebanon to meet with a highly-placed person in Hezbollah. (D.E. 74, 18). On March 10, 2010, upon his return to Toledo, Ohio, Hor and Amera Akl met with the confidential source. Hor Akl told the confidential source that, while in Lebanon, he met with representatives of Hezbollah, including a named Hezbollah official. Mr. Akl further stated that, while in Lebanon, he discussed with the official a plan to send funds concealed inside appliances and automobiles shipped to Lebanon. (D.E. 74; 19).

On June 3, 2010, the confidential source delivered $200,000 to the Akls at their home in Toledo and told them he would return later in the day with more money. (D.E. 74; 23). The Akls agreed to send the money by secreting it inside a 2004 Chevrolet Trailblazer, which they planned to send to Lebanon via a container ship. Shortly thereafter, the Akls were observed inside the residence wearing latex/rubber gloves, in close proximity to various automobile accessories, plastic wrap, duct tape, latex/rubber gloves, and fragrant insect repellant sticks. (D.E. 74; 23). Hor Akl had

prepared a portion of the money for concealment into the auto accessories, wrapped in plastic, and taped into a bundle. *Id.*

The Akls both pleaded guilty to conspiracy to provide material support to a foreign terrorist organization. Hor Akl also pleaded guilty to money laundering, bankruptcy fraud and perjury charges. Hor Akl received a sentence of 75 months imprisonment and his wife, Amera, received 40 months imprisonment.

As the Akl case involved the financial support of a terrorist organization, the facts of that case and Mr. Said's are somewhat similar. Despite this similarity, the fact that the Akls both lived in the United States, traveled abroad with the specific purpose of meeting high-level terrorist leaders, and delivered significant funds ($200,000) in support of the organization, distinguishes Mr. Said's actions. Not only was Mr. Said never a resident of the United States, but he never traveled, nor intended to travel to the United States for the purpose of committing a terrorist act. Furthermore, there is no evidence that Mr. Said met with high-ranking officials from any terrorist organization anywhere in the world; and more importantly, the amount of funds attributed to Mr. Said - $11,762 - is approximately 5.8% of the amount attributed to the Akls. In light of Mr. Akl's 75-month sentence, Mr. Said's request for a variance in this case is reasonable.

**f. Nuba Aku Yusuf - 60 Months Incarceration**

In a case very similar to Mr. Said's actions in this case, United States v. Yusef, 10-4551 (S.D. Cal. 2012), the district court sentenced Nima Yusef to eight years for providing material support to al-Shabaab. Ms. Yusef was an American citizen from Somalia, who had been granted asylum in the United States, and had taken advantage of all opportunities and benefits available in this country while living in Minnesota and then California. Ms. Yusef returned the favor by helping to recruit

and encourage other Americans to engage in jihad on behalf of al-Shabaab against the Transitional Federal Government in Somalia. Ms. Yusef directly funded and encouraged four person she knew from Minnesota, who had previously left for Somalia, to continue to fight for al-Shabaab, paying them money and monthly stipends, and trying to obtain a laptop and video recorder so that they could record statements encouraging others to wage jihad. Most of Ms. Yusuf's payments and encouragement went to Abdisalan Hussein Ali, who blew himself up in a suicide attack after recording an English audiotape encouraging others in America to wage jihad.

Despite, Ms. Yusef's whole hearted support for al-Shabaab and abuse of her American citizenship, the district court sentenced Ms. Yusef to eight (8) years incarceration, rather than the 15-year maximum. The district court concluded that the guidelines for this offense were unreasonable because the enhancements routinely jump to the maximum statutory sentence even though there is no statutory minimum and the sentences could range all the way down to zero. Id. At 30-32. While the guidelines treat acts with very different ranges of harm as though they were the same, the District Court considered that Ms. Yusef's level of support for al-Shabaab was relatively small.

Like Mr. Said, Ms. Yusef was born in Africa and was involved in providing monetary support to al-Shabaab. However, unlike Mr. Said, Ms. Yusef was an American citizen who used her citizenship as a vehicle to support all of al-Shabaab's goals, including worldwide jihad and the killing of infidels everywhere. Mr. Said's conduct falls well below Ms. Yusef's self-proclaimed support for al-Shabaab and her direct attempts to recruit Americans to fight violent jihad. Mr. Said was not an American citizen, limited his actions to Africa, did not aim to recruit Americans within the United States, and did not encourage directed violence toward the American people or its interests abroad. Based on this comparison, Mr. Said's conduct warrants no more than eight years

incarceration.

**3.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense**

A sentence of eight years (96 months), when considering the cases and sentences cited above, would adequately reflect the seriousness of the offense committed in this case. It would also serve as an effective deterrent to others who might be inclined to commit the crime of material support. Finally, a sentence of 96 months would promote respect for the law and the criminal justice system in this country, both on the part of the public and on the part of Mr. Said.

**C.      A NON-GUIDELINES SENTENCE OF EIGHT YEARS IS APPROPRIATE IN THIS CASE**

Mr. Said first set foot in this country when he was forcibly removed from Saudi Arabia and transported to the Southern District of Florida to face charges in this case. During his entire 27-year old life, Mr. Said had never sought to travel to the United States and bore no particular ill-will towards Americans.   Indeed, as confirmed in Mr. Said's plea proffer, none of his actions were directed at the United States or American citizen; rather, his actions were confined to Africa and assisting in the movement of funds to al-Shabaab and locating potential recruits within Africa.   At no point did he participate in any military training or actively seek to join al-Shabaab.   Mr. Said's actions were limited to Internet communications with co-defendant Mohamed and undercover law enforcement operatives.  His actions do not substantiate an 15-year sentence.

Mr. Said is a young man who was easily impressed with the power of the Internet and his ability to connect with other individuals.   While his communications may fall under the protections of the First Amendment in this country, his actions to move limited funds to al-Shabaab did not. This action by a foreign national, however, does not support a sentence of 15 years.  In fact, such a

sentence would be unreasonable in light of the cases outlined above.

For this reason, Mr. Said respectfully requests that the Court grant his request for a variance and sentence him to eight years incarceration, with a voluntary removal to Kenya at the completion of his sentence.

Respectfully submitted,

**PIÑERA-VAZQUEZ LAW FIRM**
International Center
1900 Southwest 3rd Avenue
Miami, Florida 33129
Tel: (305) 443-0629

    /s/ Silvia B. Piñera-Vazquez
Silvia B. Piñera-Vazquez

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on August 24, 2015, the foregoing document was electronically filed with the Clerk of the Court using CM/ECF. I also certify that this document is being served simultaneously on all counsel of record in the manner specified, either by transmission of Notices of Electronic Filing generated by CM/ECF, or in another authorized manner.

    /s/ Silvia B. Piñera-Vazquez
Silvia B. Piñera-Vazquez, Esq