**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 13-20364-CR-UNGARO**

**UNITED STATES OF AMERICA**

**v.**

**MOHAMED HUSSEIN SAID,**
 a/k/a "Bill,"
 a/k/a "Billph86,"
 a/k/a "Mohammed Salem bin Abdisheikh,"
 a/k/a "Mohamed Hussein,"
 a/k/a "Abdul-Rahman Abdul Rahim,"
 a/k/a "Tibyan,"

         **Defendant.**
_____/

## GOVERNMENT'S SENTENCING MEMORANDUM

### I Introduction

The United States of America hereby files this Sentencing Memorandum as to Defendant Mohamed Hussein Said and seeks imposition of a sentence of 180 months or 15 years' imprisonment, the statutorily-authorized maximum sentence. Said was a financier, recruiter, and facilitator for the violent al-Shabaab terrorist group in East Africa, which is linked to the larger al-Qa'ida terrorist organization, and engaged in recruiting activities for al-Qa'ida in Iraq/al-Nusrah Front, the main al-Qa'ida affiliate in Syria. This recommended sentence, though the statutory maximum, is lower than the applicable guideline imprisonment range and is the same sentence that Codefendant Gufran Mohammed (Mohammed) received. This punishment fits the crime, is consistent with the sentence imposed on Said's codefendant for the same offense, and otherwise serves recognized penal interests.

Said pleaded guilty to one count of conspiring to provide material support and resources to a foreign terrorist organization (FTO), in violation of 18 U.S.C. § 2339B(a)(1).  The statutory maximum sentence for that offense is 180 months or 15 years' imprisonment, reflecting Said's good fortune to have been arrested in 2013:  As part of the USA Freedom Act, Pub. L. 114-23, enacted June 2, 2015, Congress increased the statutory maximum sentence to 20 years' imprisonment.  Regardless, due to operation of the terrorism enhancement, see U.S.S.G. § 3A1.4 (adding 12-point victim-related adjustment and imposing Criminal History Category VI), Said's guideline range is 360 months to life imprisonment.  The parties have stipulated to the applicability of the terrorism enhancement in the Plea Agreement (DE 232 ¶ 8) and this enhancement was imposed on Mohammed's sentence as well.  The statutory maximum sentence nevertheless caps Said's exposure at 15 years, perhaps the principal benefit to him in the Plea Agreement.

Had this case gone to trial and had Said been convicted on multiple material support counts, his sentencing exposure would have been much greater.  Said was charged with eight counts of material support, the conspiracy count of conviction and seven attempt charges, each carrying a potential 15-year sentence.  If Said had been convicted of even one attempt charge, under U.S.S.G. § 5G1.2(d), those sentences could (and should) have been consecutive (because the sentence imposed on the count carrying the highest statutory maximum—15 years—would be less than the total punishment—30 years to life).  In this sense, the real benefit of Said's plea bargain is limiting his total sentencing exposure to 15 years.  Said should not be allowed the added benefit of a sentence less than 15 years, not only because of the structure of the Plea Agreement, but also because on the merits he is not worthy of a downward variance.

## II Argument

There are no factual or legal objections to the PSR that affect the guideline imprisonment range (360 to life).  The undisputed facts in the PSR hit the highlights of Said's conduct and thus support imposition of a 15-year sentence, as do the factors listed in 18 U.S.C. § 3553(a), just as they did with Mohammed.  More than that, particular pieces of evidence in this case, including conversations between the FBI online covert employee (OCE), the FBI confidential human source (CHS), and Said, and between other conspirators and Said, further support the appropriateness of a statutory maximum sentence.  Per the language of § 3553(a), the maximum 15-year sentence will: 1) reflect the seriousness of the offense; 2) promote respect for the law; 3) provide just punishment for the offense/consider the advisory guideline range; 4) afford adequate deterrence for criminal conduct; 5) protect the public from further crimes of the defendant; and 6) avoid unwarranted sentencing disparities.  There is a compelling case to be made for a maximum sentence within the framework of these factors.

### Sentence that Reflects the Seriousness of the Offense

The offense of conviction—conspiring to support three separate FTOs (al-Shabaab, al-Qa'ida, and al-Qa'ida in Iraq/al-Nusrah Front)—is a serious terrorism crime.  Said knowingly served as a fundraiser, recruiter, and facilitator for the al-Shabaab terrorist network.  He received a series of Western Union wire transfers from Mohammed for the purpose of funding al-Shabaab.  Said further communicated with an OCE, who was posing as a terrorist fundraiser, recruiter, and supplier, and selected no less than four seasoned terrorist operatives to work with the OCE.  Said planned to send these individuals to Syria, where they would wage violent jihad on behalf of the al-Qa'ida and al-Qa'ida in Iraq/al-Nusrah Front terrorist groups.  Said also offered to make available potential martyrs for ambitious al-Qa'ida-style attacks against United

States interests. Mohammed had introduced the OCE to Said for the purpose of supporting these organizations, and Said, with Mohammed's continued assistance, endeavored to do so.

In terms of fundraising, this case involves Western Union wire transfers that Said knowingly received from Mohammed for the support of al-Shabaab. Mohammed started sending funds to Said in June 2011, just after a May 2011 meeting in Saudi Arabia where they had finalized their plans. The total amount of documented wire transfers to Said, consisting of the seven wire transfers charged as overt acts in Count 1 of the Indictment, was approximately $11,672. According to Western Union records, Mohammed used other individuals to send the transfers. Said used his wife, and twice went himself, to pick up the transfers sent to him by Mohammed and his associates. The Count 1 conspiracy further alleges additional wire transfers from Mohammed to the OCE in support of al-Qa'ida in Iraq/al-Nusrah Front, which constitute additional relevant conduct for purposes of Said's sentence because Said was also working with the OCE to obtain recruits for the same group. The total amount of the wire transfers and other forms of finance, including currency and gold, involved over $30,000 earmarked for providing weapons, recruits, and other forms of terrorism support.

The money transfers particularized in the Indictment are not the only ones in which Said was involved. Said provided accounts of his past financial activities to both the OCE and the CHS. In those accounts Said admitted to receiving from a Bosnian source 1.5 million Kenyan shillings, described as almost $17,000, which was couriered to Egypt and then sent to Somalia via hawala, with the ultimate intended recipient being al-Shabaab (OCE Tr., 10/4/12). Although Said noted that he would get the funds to Somalia, and from there al-Shabaab would purchase what it needed, at one point he was asked to acquire antitank weapons and solicited the OCE as a source for weapons as well (OCE Tr., 10/2/12). Said himself confirmed to the CHS that he had

4

methods of getting monies to the "inside," a code word for Somalia or al-Shabaab, through a cover business in his name, hawalas, and boat shipments along the coast (CHS Tr., 9/18/12; OCE Tr., 10/2/12). Accordingly, Said confirmed that al-Shabaab actually received donations that he had handled and thus could purchase needed supplies, including weapons.

Said was also involved in the recruitment and handling of foreign nationals for al-Shabaab and, over the course of the OCE and CHS conversations, he mentioned some of them by name. One exchange summed up his main activities and illustrates that, though the wire transfers were a centerpiece of the Indictment, Said himself was proud of his recruitment activities:

> OCE:  So if I understood correctly from you, you mainly got the money inside to the brothers and they got what they needed from there.  Correct?
> Said:  [Y]es brother plus dealing in connecting and recruiting foregners [sic] as this could be main reason british had come themselves to investigate the matter

(OCE Tr., 10/2/12). Said made a similar point to the CHS, whom Said believed to be a United States citizen, while attempting to recruit the CHS to travel to Kenya, train with al-Shabaab, and then return to the United States to commit an attack on the CHS's homeland:

> Said:  I wanted you the moment you be in Kenya not to go anywhere else other than the field [Somalia or al-Shabaab] bz the authorities (kuffarr) arnt that stupid brother, they hav already suspected that I was having connection with the brothers from UK they were even asking the uk bro whom they cought [sic] in last December abt me further more even showing him my pictures

(CHS Tr., 3/1/12). The brother from the United Kingdom whom they caught was John Germaine Grant, an associate later identified by Said with his kunya or war name, "Salahudeen" (OCE Tr., 7/2/12, 8/10/12). Grant is presently standing trial in Kenya for a plot to bomb hotels in that country. The fact that Said thought it important to supplement his resume in these exchanges with his recruiting activities shows that those activities were important to him.

In fact, Said offered to the OCE a group of experienced terrorist operatives, including al-

5

Shabaab fighters, who could engage in violent jihad in Syria or otherwise work for al-Qa'ida and al-Qa'ida in Iraq/al-Nusrah Front.  Said identified multiple recruits with al-Qa'ida and al-Shabaab affiliations and talked with the OCE about how to move them to Syria.  Said admitted that two of the recruits had military training and had fought for al-Shabaab in Somalia (OCE Tr., 7/25/12, 8/17/12).  He also admitted that a third recruit had participated in a May 2012 attack on the Bella Vista Bar in Mombasa, Kenya, when the recruit and other armed men threw grenades and fired their weapons into the bar (OCE Tr., 7/25/12).  And Said revealed that a fourth recruit in Saudi Arabia had been associated with al-Qa'ida in East Africa, had traveled to fight for al-Qa'ida in Yemen, and had been involved in attacks on the Paradise Hotel and an Israeli civilian jetliner in Kenya (OCE Tr., 8/1/12).  Said identified each of these individuals by name and sent to the OCE electronic copies of the passports for three of them.  The fourth recruit provided his passport to the OCE himself, corroborating Said's claims.

Additional evidence in the investigation further confirmed that Said was experienced in handling personnel for al-Shabaab.  From March 2011 to January 2012, Said worked with Mohammed and an individual named Rahatul Khan to facilitate the movement of an individual from the United States to Somalia, where he would join al-Shabaab or otherwise participate in violent jihad.  This individual was in fact the CHS with whom Said discussed travel routes, al-Shabaab training, and possible terrorist operations.  Unrelated to the CHS but around the same time, in March and April 2011, Said worked to facilitate the movement of two United Kingdom recruits from Kenya to Somalia, where they too would join al-Shabaab or otherwise wage violent jihad.  Said spoke via email with an individual in Somalia about these recruits and these emails were later uncovered through search warrant returns.  The conversation was coded and the recruits were referred to as "tomatoes" and "dogs."

The evidence of the two United Kingdom travelers—the "tomatoes" and "dogs"—came from actual email exchanges between Said and another conspirator, but there is still other proof that Said was prolific in the handling of al-Shabaab recruits.  Before he introduced the CHS to Said, Mohammed told the CHS that Said "has helped brothers from UK too" (CHS Tr., 6/7/11) and that "[Said] is the brother the brothers in UK contact him and go through him to Somalia as he has knowledge of it" (CHS Tr., 6/30/11).  Said himself told the CHS that he was "communicating with brothers from uk" and that "they are in the field [Somalia or al-Shabaab]" (CHS Tr., 10/30/11).  It is not known whether these recruits are the same "tomatoes" and "dogs" that Said had discussed a few months before, but his connection to Grant, the British national accused of the bomb plot in Kenya, and to the al-Qa'ida fighter in Saudi Arabia indicates a wider circle of terrorist operatives.  Said was a vital link for money and recruits for al-Shabaab and his efforts here alone warrant a maximum sentence.

Promote Respect for the Law

A sentence at the statutory maximum of 15 years' imprisonment is significantly—half the time, in fact—below the bottom of Said's guideline imprisonment range of 360 months to life. The structure of the Plea Agreement itself has already bestowed the main benefit of Said's plea bargain and thus any justification Said could advance for a further reduction below 15 years would undermine respect for the law in a serious terrorism case.

Provide Just Punishment for the Offense and
Consideration of the Advisory Guideline Range

As discussed above, Said has received a significant reduction of his potential sentence as a result of his plea to only one of multiple charged material support counts.  Any further request for reduction would assuredly not provide adequate punishment for the offense and further grossly undercut a guideline imprisonment range already capped by the statutory maximum.

7

<u>Afford Adequate Deterrence to Criminal Conduct</u>

A maximum sentence for Said would serve the ends of both personal and general deterrence.  Said's crimes were born of extreme interpretations of Islamic religion and ideology, not opportunity or profit, and thus his case poses a particular challenge for personal rehabilitation.  "'[T]errorists[,] [even those] with no prior criminal behavior[,] are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation.'"  <u>United States v. Jayyousi, et al.</u>, 657 F.3d 1085, 1117 (11th Cir. 2011), <u>cert. denied</u>, 133 S. Ct. 29 (2012) (quoting <u>United States v. Meskini</u>, 319 F.3d 88, 92 (2nd Cir. 2003)).  Accordingly, the best courts can do is incapacitate such a defendant as long as legally possible and bank on rehabilitation (and if Said's sparse and unrepentant "acceptance of responsibility" statement is any indication, rehabilitation is very much needed here).  A recent sentence from this district, where the court failed to incarcerate an al-Qa'ida recruit "at or near the maximum term authorized," was deemed to reflect "a clear error of judgment."  <u>Id.</u> (citing 28 U.S.C. § 994(h)).  One reason was that the recruit had actually been inside the terrorist group and thus posed a "heightened risk of future dangerousness due to his al-Qaeda training."  <u>Id.</u>  Anything less than a maximum sentence, or something very close to it, for an insider like that would have been, and was, substantively unreasonable.

In this case, Said too has worked on the inside of a terrorist group, but far from being a mere recruit or foot soldier, he claimed a connection to the command structure itself.  Said confirmed that, at one point, he was paying for a safe house for individuals in Kenya on direct orders from Abu Zubeir, the emir or top leader of al-Shabaab.  One of them was Fuad Manswab who, along with Grant or "Salahudeen," was later arrested for the hotel bomb plot but escaped after release on bond (OCE Tr. 2/2/13, 7/13/13).  Said also explained that he wanted to improve

coordination between al-Shabaab cells in Kenya and the main al-Shabaab organization in Somalia. To this end, Said offered to coordinate meetings with Abu Zubeir and other terrorist group leaders. Said was also willing to forge an alliance between al-Shabaab and al-Qa'ida in Iraq/al-Nusrah Front, and confirmed that he could facilitate communication with the highest levels of al-Shabaab (OCE Tr., 4/11/13). This shows not only preferential access as a trusted terrorist leader, but also broader strategic thinking, which itself is extremely dangerous.

Said's importance is proven not only by his own words, but also by what followers said about him. For example, the OCE spoke to Said's fourth Syria recruit, Salman Khamis, who had the al-Qa'ida in Yemen connection and had participated in the Paradise Hotel and Israeli jetliner attacks. Not long after Said's arrest, Khamis emailed the OCE. (Said himself had earlier put them in touch.) Khamis wrote, "Aa, how are you bro? Dd u heard abt tha big br0? So sadly bro, how z everthng? Y so silent?" (OCE Tr., 8/29/13) (emphasis added). The reference to Said as "tha big br0," or "that big brother," means that Said was seen as a leader. Understanding Khamis to lament Said's arrest, the OCE responded, "I did hear abt th big bro. that is why I am silent akhi [brother]" (Id.). This evidence would have been admitted at trial to prove Said's identity because a known terrorist was talking about the arrest of a man denying terrorist connections, but now at sentencing it proves how significant Said's arrest was. This seasoned terrorist operative was lamenting that his leader had been taken out of the fight.

Said's significant ties to the al-Shabaab organization, as well as in the wider terrorist world of East Africa, Europe, and the Middle East, demand a maximum sentence, but so does the importance of general deterrence in a world of Internet and social media recruitment. Said made effective use of the Internet while communicating with donors and recruits, so a lengthy prison term will both remove him from the virtual world and, one would hope, deter a wider audience.

Of course, rational choice deterrence may be less effective with Islamic terrorists (just as it is notoriously difficult to deter truly irrational crimes, such as crimes of passion).  Deterrence requires a rational actor who can change his mind to avoid punishment.  But whatever its limits, general deterrence will only be served in this case by a harsh sentence, not by a lenient one.  This is particularly true in a world where al-Shabaab and its counterparts make effective use of the Internet to reach those who have not yet been indoctrinated.  This target audience of the terrorists is the group most effectively deterred by lengthy prison terms imposed on the terrorists themselves.  See United States v. Bell, 2015 WL 179172, at *16 (M.D. Fla. Jan. 14, 2015) (imposing 20-year sentence for two counts of material support and acknowledging "that general deterrence of others from taking the first step along the path to radicalization is an important component of Bell's sentence").

Protect the Public from Further Crimes of the Defendant

Of course a maximum prison sentence serves the ends of incapacitation and denies a dangerous terrorist group of Said's services for as long as legally permissible.  It also protects the public in a broad sense because it renders al-Shabaab incrementally weaker than it otherwise would have been.  Al-Shabaab has been known to undertake terrorist operations against civilian targets in East Africa, such the mall attack in Nairobi and the school attack in Garissa, just to name two examples from Kenya.  But a lengthy prison sentence for Said also protects the public, and particularly the American public, in a more direct and acute sense.  This is because of Said's specific terrorism activities, and not simply finance and general recruitment.  Said is a particularly dangerous man because he looked for opportunities to attack American targets, both within the United States and abroad, and solicited individuals with the particular purpose to send them on those missions.

10

Said attempted to recruit the CHS, a United States citizen, to attack the United States homeland.  Said likened this mission to the 2011 terrorist attacks in Norway: "[H]e [the Norway attacker] killed 96 of his brothers, imagine finding a 1 of our bros and do this to amerika…akhi [brother] if we want some1 to do that for us, aare you ready akhiu [brother]?" (CHS Tr., 9/1/11).  Said pressed the CHS on his willingness to kill innocent people: "[I]ts important for us to knw if you accept killing these kuffar whom they call 'civilians'" (Id.).  And there is this:

> [T]hat land [the United States] is full of oportunties [sic] to harm theose [sic] duffer [kuffar], as it's the beggest [sic] snake that kills us….the moment yu will be in the ranks [of al-Shabaab], you will knw how precious it is to kill those ppl [people]

(CHS Tr., 8/18/11).

Along the same lines, Said offered to the OCE the services of a person from the United Kingdom who could travel to the United States to conduct a suicide attack: "[H]e is willing to join any group and if you want o [to] gv [give] him a work in US, like martyrdom operations, that wont be a problem…" (OCE, Tr., 2/5/13) (emphasis in original).  Said compared this mission to the 9/11 attacks, and referenced the 19 hijackers: "[I]ll ask him if he wishes to be like those 19 brothers…" (Id.).

Said also looked for chances to strike American interests abroad.  Said conceived of a plot to assassinate then-U.S. Secretary of State Hillary Clinton when she visited Kenya and regretted not acting when he had the chance: "[J]ust last week this bitch Hillary Clinton passed a rod [road] which is just a few meter away from where I live and she is still alive till today glory be to Allah I was always thin [thinking] abt [about] doing something bt [but] Allah knws [knows] best why nothing happen…" (OCE Tr., 8/12/12) (emphasis in original).

Likewise, Said admitted to being part of a plot to bomb a hotel in Nanyuki, Kenya, where United States soldiers were believed to stay, but when his accomplices were arrested with bomb-

11

making materials, the plan fell apart:  "[W]e were having some missions to do it in a place here in Kenya where there are many amerikin, in fact amerikan soldiers a place called nayuki, bt [but] Allah didn't permit it as for the brothers who are suppoe [supposed] to work with me are 1 is in case captured in December last year and second is wanted by Kenyan authorities…" (Id.).  This reference to "the brothers" means Grant, who is standing trial, and Manswab, who is now a fugitive, both of whom were arrested and charged by the Kenyans in connection with preparing for this hotel attack.

These passages are chilling.  Said envisioned grandiose terrorist operations that would inflict mass civilian casualties—on Americans.  As his recruitment of actual terrorists for the Syria mission illustrates, Said was not just a dreamer but also a doer, an operator.  He had the personnel available to undertake terrorist attacks, but perhaps lacked the means to strike a "far enemy" like innocent United States citizens in their cities and towns.  That is one reason why he was enthusiastic to work with the OCE and the CHS, who purported to have connections in the United States.  Said is a continuing danger to the United States because he not only holds an abstract allegiance to al-Shabaab, but he also could formulate concrete operational plans.  And as the arrests of Grant and Manswab indicate, these plans were not merely notional; they were real and could be put into effect.  Said attempted to plan and recruit for martyrdom operations that would murder American diplomats, soldiers, and civilians and thus he should receive an American sentence of 15 years and not a day less.

Need to Avoid Unwarranted Sentencing Disparities

Recognizing the futility of the exercise, this Court declined to impose a sentence on Codefendant Gufran Mohammed based on material support sentences handed down in other cases.  Each case is different and, as this Court recognized, therein lies the problem with such

12

comparisons.  However, it is a different proposition altogether to compare sentences between coconspirators who have pleaded guilty to the same offense in the same case.  That is an easier and more productive exercise.  Here, Mohammed was sentenced to the maximum 15 years' imprisonment and Said, as his coconspirator, deserves no less.  To be sure, Mohammed was a financial backer and a jihad recruiter, but he was not a card-carrying member of any terrorist organization.  In the parlance of sports, Mohammed was a freelance talent scout, not a team coach or manager.  That is why he needed someone like Said, who was actually on the inside of a terrorist group, to ensure that his financial contributions and recruitment efforts produced tangible results.

The case evidence shows that the charged conspiracy coalesced only when Mohammed met Said, though there is ample evidence that Said was involved in al-Shabaab activities long before the charged timeframe.  Mohammed too was involved in the Authentic Tauheed chatroom before he met Said, spotting and assessing potential al-Shabaab recruits, but this fact itself highlights a reason why Said should receive at least the same 15-year sentence.  Although Mohammed was active in public Internet forums and Said was not (Said never participated in any "chat room"), that is because Said relied on freelancers like Mohammed to go online and generate leads for al-Shabaab donors and recruits.  By virtue of his position, Said could afford the luxury of not exposing himself and could count on others to make the initial cut when it came to conspirators.  This is how the OCE was handled, with Mohammed sizing up this purported al-Qa'ida operative from Iraq and Syria and then making the introduction to Said.  Only when it appeared to be worth Said's time and attention did he engage the OCE in lengthy discussion and planning.

And once the OCE entered the picture, Mohammed and Said took on almost coequal

roles in supporting al-Qa'ida and al-Qa'ida in Iraq/al-Nusrah Front, groups the OCE purported to represent.    Because Mohammed had access to discretionary funds, he was able to funnel donations to the OCE, which ended up in the hands of the FBI.   By contrast, Said was perennially strapped for funds, but he had access to the al-Shabaab group and, through that connection, terrorist operatives in East Africa, Europe, and the Middle East.   Accordingly, Said played to his strengths with the OCE and recruited experienced al-Shabaab fighters to travel to Syria.    In this sense, when it came to al-Qa'ida and al-Qa'ida in Iraq/al-Nusrah Front, Mohammed and Said were prepared to divide responsibilities between finance and recruitment. Both are equally important terrorism support activities and, as such, this too counsels in favor of a 15-year sentence for Said, though his earlier and ongoing activities with al-Shabaab alone would have supported that result.   Mohammed and Said shouldered equal burdens when it came to supporting al-Qa'ida and al-Qa'ida in Iraq/al-Nusrah Front and thus they should shoulder equal prison terms for that crime.

### III Conclusion

For all of the foregoing reasons, the government respectfully requests that this Court impose a sentence of 180 months or 15 years' imprisonment.

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY


By:   /s/ Brian K. Frazier
Brian K. Frazier
Court No. A5500476
Ricardo A. Del Toro
Fla. Bar No. 597585
Assistant United States Attorneys
99 N.E. 4th Street
Miami, Florida 33132

14

Telephone: (305) 961-9000
Facsimile: (305) 536-4675

Jolie F. Zimmerman
Trial Attorney, Counterterrorism Section
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
Telephone: (202) 514-1453
Facsimile: (202) 514-8714

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on August 25, 2015, I electronically filed the foregoing pleading with the Clerk of the Court using CM/ECF.

/s/ Brian K. Frazier
Brian K. Frazier