```
                UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
                Case No. 13-20364-Cr-UNGARO

UNITED STATES OF AMERICA,        )
                                 )
               Plaintiff,        )
                                 )
        -v-                      )
                                 )
GUFRAN AHMED KAUSER MOHAMMED,    )
                                 ) Miami, Florida
              Defendant.         ) November 20, 2014
                                 ) 1:40 p.m.
```

                   VOLUME 2 of 3 - Pages 1-37

              TRANSCRIPT OF SENTENCING PROCEEDINGS

               BEFORE THE HONORABLE URSULA UNGARO

                     U.S. DISTRICT JUDGE


APPEARANCES:

For the Government          RICARDO DEL TORO and BRIAN K. FRAZIER
                            Assistant U.S. Attorneys
                            99 Northeast 4th Street
                            Miami, Florida  33132-2111


For Defendant               HELAINE B. BATOFF and SOWMYA BHARATHI
Mohammed                    Assistant Federal Public Defenders
                            150 West Flagler Street
                            Miami, Florida  33130


REPORTED BY:                WILLIAM G. ROMANISHIN, RMR, FCRR, CRR
(305) 523-5558              Official Court Reporter
                            400 North Miami Avenue
                            Miami, Florida  33128

        STENOGRAPHICALLY RECORDED COMPUTER-AIDED TRANSCRIPT

1          (Call to order of the Court)

2          THE COURT:  Okay.  Good afternoon.

3          So the case before the Court is the United States

4    versus Gufran Ahmed Kauser Mohammed, 13-20364 for sentencing.

5          Who's here for the United States?

6          MR. DEL TORO:  Good afternoon, Your Honor.  Rick

7    Del Toro and Brian Frazier for the United States along with

8    Special Agent Justin Acres of the FBI.

9          THE COURT:  Okay.  Fine.  You can have a seat.

10          And who's here from Probation?

11          THE PROBATION OFFICER:  Your Honor, I apologize.

12    Sara Garcia with Probation.

13          THE COURT:  Okay.  Thank you.

14          And who's here for Mr. Mohammed?

15          MS. BATOFF:  Good afternoon, Your Honor.  Helaine

16    Batoff and Sowmya Bharathi from the Federal Public Defender's

17    on behalf of Mr. Mohammed, who is present before Court.

18          THE COURT:  Are we ready to proceed to sentencing?

19          MS. BATOFF:  We are, Your Honor.

20          MR. DEL TORO:  Yes, Your Honor.

21          THE COURT:  So all the issues with counsel are now

22    resolved, is that right, Mr. Mohammed?  You want to go ahead

23    with your sentencing?

24          THE DEFENDANT:  Yes.

25          THE COURT:  All right.  Fine.  Have a seat.

1          The statutory maximum in this case trumps the
2    guidelines at 180 months, and the parties reserved the right
3    to make an argument for a Booker variance.  Essentially, the
4    argument is that a lesser sentence is in order in light of
5    other similar cases that have been decided by other judges.
6          So, I did ask Probation to give me some information
7    on what sentences have been imposed in this district in cases
8    involving the same offense of conviction.  I think it's very
9    hard to compare facts, really, to ask Probation to do that.
10   If we're going to do that, the lawyers are going to have to do
11   that.  You know, the sentences are all over the block, and
12   it's a little hard to make the kinds of comparisons that the
13   Public Defender's office is asking the Court to make.  But
14   most of the sentences have been less than 180 months.
15         In fact, from what Probation has provided me, all but
16   two of them -- no, all but three -- no, wait.  Let me see.
17   All but two have been less than 180 months.
18         What?
19         THE PROBATION OFFICER:  Your Honor, there are some
20   that are 300 months.
21         THE COURT:  I only see one that's 300 months on your
22   list, which is Mr. Akan.
23         MR. DEL TORO:  Yeah.  And they're in order.
24         THE COURT:  Right.  And then there's Franklin
25   McField-Bent who was sentenced to 180 months, and that's it.

1    Everybody else is under 180 months.  Even Narcille Batiste,

2    who, if I recall correctly, was the leader of the Liberty City

3    whatever it was that was in front of Judge Lenard -- right, is

4    that right?

5              MS. BATOFF:  Yes, Your Honor.

6              THE COURT:  Okay.  So, I mean, we could go through

7    these one by one and I could ask the Government to tell me

8    what's different about these facts.  I don't know whether or

9    not that would be productive.

10             Basically, the Government's argument is, look, he

11   committed a serious crime.  No question about that, it is a

12   serious crime.  I think that the current political

13   environment, you know, heightens and helps to emphasize the

14   Government's point in that regard.

15             In addition, the Government argues that he made

16   efforts to recruit others to go and participate in these

17   insurgencies that are occurring in these Middle Eastern

18   countries.  On that point I think it would be helpful if the

19   Government would get into these facts on a very detailed basis

20   as to this defendant.

21             Okay.  Go ahead, Mr. Del Toro.

22             MR. DEL TORO:  Thank you, Judge.

23             Your Honor, this is a very different case than

24   Narcille Batiste, a case where the defendants provided

25   themselves to an undercover agent for potentially membership

1  in al-Qaida or to conduct Jihad.

2       THE COURT:  And to commit specific terrorist acts, as

3  I recall, although I wasn't the presiding judge, and domestic

4  terrorist attacks, I believe.

5       MR. DEL TORO:  Well, no actual attacks, Judge.

6       THE COURT:  No, I know that.  But wasn't that the

7  idea, that they were domestic terrorists?

8       MR. DEL TORO:  They had the intent and they had done

9  overt acts in furtherance --

10      THE COURT:  Right, of their intention to commit

11  domestic acts of terrorism.

12      MR. DEL TORO:  Yes, Judge.

13      THE COURT:  Of a significant nature.

14      MR. DEL TORO:  Of a significant nature.

15      THE COURT:  To kill people.

16      MR. DEL TORO:  To kill people.

17      THE COURT:  Yes, in large numbers.

18      MR. DEL TORO:  Right.

19      THE COURT:  Yes.

20      MR. DEL TORO:  But in those cases --

21      THE COURT:  Yes.

22      MR. DEL TORO:  -- the activities are less significant

23  than some of the acts that this defendant committed, the

24  persuasive nature of the conspiracy that he was involved in,

25  and the number of acts, the number of terrorist organizations

1   that the defendant actually supported.

2         In this case, the defendant was involved in 15

3   separate overt acts in furtherance of a conspiracy to support

4   three designated terrorist organizations:  al-Qaida, al-Nusra

5   Front and al-Shabaab.

6         THE COURT:  Explain this to me because I just don't

7   recall.  The defendant sent basically money orders, as I

8   recall, to his codefendant.  Did he write on the subject line

9   or in the notation portion of the money order "al-Nusra

10  Front"?  How did he designate what he wanted to go where?

11        MR. DEL TORO:  He was talking to two different

12  purported coconspirators, natural coconspirator, Mohamed Said,

13  and through online communications and with the Online Covert

14  Employee of the FBI, he admitted that he was sending the money

15  for al-Shabaab, which is the organization that committed,

16  obviously, the horrible terrorist bombings in Kenya, which is

17  involved in killing civilians, which is involved in terrorist

18  acts, which is an al-Qaeda affiliate in Somalia.

19        The OCE purported to be a facilitator and recruiter

20  for al-Nusra Front, the al-Qaeda affiliate in Syria, and the

21  defendant did two things with respect to these organizations.

22  Not only did he provide 15 separate payments of support

23  totalling over $30,000 over the course of two years, but he

24  also then engaged in recruiting for each of these

25  organizations.  There's evidence --

1           THE COURT:  So tell me all about that.  Tell me as

2  much detail about that as you probably can.

3           MR. DEL TORO:  Yes, Judge.

4           In May of 2011, the defendant was active in a Jihadi

5  chat room that he managed.  He solicited an individual there

6  to spot recruits for al-Shabaab because he was working already

7  with Mohamed Said and was already in the process of sending

8  him Western Union funds for the purpose of terrorist

9  activities.  So he tried to recruit this one individual

10 himself, who is a defendant in a case in Austin.  His name is

11 Raja Tu Akan.

12          In addition to trying to recruit Mr. Akan, the

13 defendant also attempted to recruit a confidential human

14 source that the FBI had who entered these Jihadi chat rooms

15 and then passed him on to Mohamed Said as a potential recruit,

16 as a terrorist fighter to go to Somalia to work in Somalia.

17          In addition, he tried to recruit individuals from

18 al-Shabaab through Said to go to the Online Covert Employee

19 who was, again, posing as an al-Nusra terrorist facilitator.

20 So they would travel from Africa to Syria in aid of the

21 al-Nusra Front, the al-Qaeda affiliate.

22          In fact, Said did send the Online Covert Employee

23 passport images of four actual al-Shabaab terrorists who were

24 going to travel.  So this is real recruitment.

25          THE COURT:  I'm sorry.  For what purpose?

1          MR. DEL TORO:  For the purpose of joining the right

2    with al-Nusra Front in Syria.  These were experienced

3    terrorist fighters from al-Shabaab who had been involved in

4    Africa, and for them to travel through Mohammed and Said to

5    the Online Covert Employee again posing as --

6          THE COURT:  So they were going to go on the covert

7    online employee or the online employee was going to go to

8    them?

9          MR. DEL TORO:  They were going to go to the Online

10   Covert Employee who was posing as an al-Nusra Front

11   facilitator for the Jihadi fight in Syria.

12         THE COURT:  I see.  Okay.  I got it.

13         MR. DEL TORO:  What we're talking about, Judge, is

14   two years of support and recruiting three different designated

15   terrorist organizations.  In addition to that, during meeting

16   that Gufran Mohammed and Said had in Saudi Arabia, Mohammed

17   made payments to Said, one of which was a gold bar intended

18   for the Afghan Taliban, an organization that was actively

19   involved in combat and killing Americans.

20         THE COURT:  And how do you know that?  How do you

21   know the gold bar was to assist the Afghan Taliban?

22         MR. DEL TORO:  I believe, Your Honor, it was actually

23   admitted to the OCE.

24         THE CASE AGENT:  To the undercover.

25         MR. DEL TORO:  To the undercover agent of the FBI who

1  met with Gufran.

2           THE COURT:  So Gufran was bragging.

3           MR. DEL TORO:  Yes.  And the gold bar, I'm sorry, was

4  given to the undercover agent in Saudi Arabia.

5           THE COURT:  Okay.  It was given to the undercover

6  agent in Saudi Arabia.

7           MR. DEL TORO:  It was the undercover agent who was in

8  Saudi Arabia.

9           THE COURT:  Okay.  So just refresh my recollection.

10 Both of them met with the undercover in Saudi Arabia?

11          MR. DEL TORO:  No.  Mohamed Said and Gufran Mohammed

12 met in Saudi Arabia previously, and then in a later meeting

13 Gufran Mohammed in Saudi Arabia provided these payments to the

14 undercover agent.

15          THE COURT:  I see.

16          MR. DEL TORO:  In addition to the 15 separate

17 payments, Judge, over two years and the recruitment

18 activities, the defendant actually authorized to the Online

19 Covert Employee that the funds that he provided to the OCE be

20 used to buy weapons, and he specifically stated including

21 grenade launchers, and specifically authorized that the money

22 be used for an attack on U.S. citizens or on the UN.

23          And that, Judge, is the essence of the intent in this

24 case.  This is not an individual like the defendant in the

25 Hubber case which defense counsel cites in her brief where the

1  defendant was providing money that he intended to be used for

2  widows and orphans of Hamas.  Rather, these were funds

3  intended to actually facilitate and support terrorist

4  activities, the killing of innocent civilians and specifically

5  the killing of Americans, or as he said, the United Nations.

6        I think another aggravating factor in this case is

7  that the defendant is an immigrant to this country.  He came

8  to this country.  He received naturalization, his citizenship,

9  and he immediately left for Saudi Arabia to engage in the

10 terrorist activities that he engaged in.  And I think that

11 that shows, Your Honor, that there is a lesser possibility of

12 rehabilitation in this case.  It shows the need for

13 deterrence.  It shows the need for a sentence that is at the

14 higher end.

15       I would submit to the Court that the Batiste case is

16 not an adequate analogy to this case.

17       THE COURT:  No, I wouldn't imagine it is.  I don't

18 know what would be.  It's very hard to compare the facts of

19 these cases.  While I appreciate what the defense did, to

20 actually make any kind of sensible rational comparison would

21 really require delving into the facts of each one of these

22 cases very deeply.

23       MR. DEL TORO:  And I think that there is a case that

24 is very similar and almost on point but actually a little less

25 egregious in some sense than this case, and that's the Khan

```
 1  case.  The big distinction is that he went to trial.  So you
 2  could discount three points for acceptance of responsibility.
 3  But in that case, the defendant was soliciting, collecting and
 4  transferring money to support the Pakistani Taliban, which is
 5  a designated terrorist organization.
 6          THE COURT:  Wasn't he running a mosque?  Isn't this
 7  the guy that was running a mosque?
 8          MR. DEL TORO:  Yes, Judge.  He was a legitimate Imam,
 9  but he was also sending money to the Pakistani Taliban for
10  purpose of guns, which is similar to what Gufran Mohammed did
11  in this case, to sustain militants and their families and to
12  generally promote their cause.  He financially supported a
13  madrasah, which is a school, religious school where children
14  are indoctrinated and where some of the Pakistani Taliban were
15  housed.
16          In this case we have essentially the same thing.  We
17  have the financial support of three terrorist organizations
18  instead of one.
19          THE COURT:  I assume that Khan's financial support
20  was much greater than it was in this case.  No?
21          MR. DEL TORO:  Judge, I don't have the exact amount
22  of that.
23          THE COURT:  I mean, Khan had access to greater
24  resources, right, because he was running this mosque.
25          MR. DEL TORO:  But I think that the amounts were
```

1   actually fairly small amounts, gradually, sort of like in this

2   case, where the amounts accumulated over time.

3          In addition to directing that --

4          THE COURT:  And also didn't Khan have more direct

5   influence over the people that he was attempting -- and wasn't

6   he actively attempting to influence people to become involved

7   in these kinds of activities?

8          MR. DEL TORO:  Not to my knowledge, Judge.  I don't

9   have any further detail as to what exactly he was doing.

10         But in this case we do have that.  Gufran Mohammed

11  was doing that.  He was recruiting two individuals at least to

12  go fight for al-Shabaab, Raja Tu Akan and the CHS, and for

13  additional individuals to come from Africa to fight for

14  al-Nusra Front.

15         So in the instant case we certainly do have that.  We

16  have extensive recruiting activities for two different

17  terrorist organizations and multiple people.  We also have,

18  like in Khan, the direction that his funding be used for the

19  purchase of weapons.

20         What we have in this case that Khan doesn't have is a

21  specific request or approval that the money be used on an

22  attack on Americans or the United Nations, and that, to my

23  knowledge, was not evidence that the Government presented in

24  the Khan case.

25         Judge, I don't know if it would be worthwhile for me

1    to go through the 3553(e) factors.  I came prepared to go

2    through that and to cite to the Court some of the facts that

3    support each of them.

4              THE COURT:  Well, in a way you have, haven't you?

5              MR. DEL TORO:  I have.

6              I did want to bring up to the Court one important

7    fact I think that is significant, the protection of the

8    public.  That can't be overstated in this case.

9              We're not talking about individuals who don't have

10   the ability to actually commit a terrorist attack.  We're not

11   talking about simply a sting investigation where the crime is

12   essentially fabricated by the Government and provided to the

13   defendant.  We are talking about a person who came into this

14   country, became a U.S. citizen, betrayed his country

15   immediately, immediately after he became a U.S. citizen, and

16   left --

17             THE COURT:  Can you give me the timing on that?

18             MR. DEL TORO:  Yes, Judge.

19             May 30, 2010, the defendant sent an e-mail to an Imam

20   or religious scholar talking to him about whether it would be

21   proper for him, I guess, and true to his religion for him to

22   take the oath of U.S. citizenship because he said that he

23   wanted to do it so he could travel to the Middle East to help

24   brothers struggling with finances.  And, of course, throughout

25   all of the communications "brothers" means members of the

1  terrorist organizations.  So that was May 30, 2010.

2        Early in 2011 -- or in June of 2011, he begins to

3  send money to al-Shabaab, to Mohamed Said.

4        THE COURT:  And when does he take the oath of

5  citizenship?

6        MR. DEL TORO:  It was shortly after May of 2010, Your

7  Honor.

8        THE COURT:  And in June he begins to send money.

9        MR. DEL TORO:  And in June of 2011, a year later, he

10  is sending money to Mohamed Said for the purpose of supporting

11  al-Shabaab, the al-Qaeda affiliate in Somalia.

12        THE COURT:  And does he ever explain why he went he

13  ahead and took the oath of citizenship?

14        MR. DEL TORO:  Judge, although what he told to the

15  individual, the religious scholar, is instructive on that, he

16  specifically said that he wanted to know whether taking the

17  oath of citizenship would essentially violate the Muslim

18  tenants because he wanted to go travel to the Middle East to

19  help brothers struggling with their finances and he wanted the

20  ability to be able to travel back and forth easily.

21        Now, again, in June he begins sending money to

22  Mohamed Said, and before that, in May of 2011, he's in this

23  chat room beginning his recruiting activities asking Raja Tu

24  Akan to go travel for Jihad for al-Shabaab.

25        So the defendant does this.  He goes abroad and

1   immediately begins providing support to terrorist

2   organizations and then engages in this two-year pattern of

3   support of recruiting.

4          You know, the question of protection of the public

5   and the question for the Court is, is this defendant, once

6   he's released, going to be a public safety hazard, and if so,

7   then the sentence should be the highest possible.

8          I cite for the Court the Jayyousi opinion, which is

9   the Jose Padilla opinion, where the Court stated, quote:

10  "Terrorists, even those with no prior criminal behavior, are

11  unique among criminals in the likelihood of recidivism, the

12  difficulty of rehabilitation and the need for

13  incapacitation."  And that really is the crux of this case.

14         What the defendant has gotten through the plea

15  agreement in this case, Judge, is essentially a 30-month

16  variance from 210 months at the bottom of the guidelines to

17  180 months, which is the statutory maximum.  So he's gotten

18  his variance already.  And that took into account his lack of

19  criminal history, the fact that he hadn't committed any crimes

20  before, and all of the mitigating factors that the defense has

21  cited.

22         However, there are aggravating factors with respect

23  to those person characteristics and lack of criminal history,

24  because, as I mentioned, as an immigrant to this country, the

25  first thing he did once he became a citizen is to engage in

1    these crimes against this country.

2         THE COURT:  Right.  And in retrospect, in light of

3    recent events, that's alarming.

4         MR. DEL TORO:  It is, Judge.

5         And what the defendant is asking is for a second

6    variance.  He's asking for not just the 30-month variance but

7    now a second variance of more than 50 percent below the low

8    end of the Sentencing Guidelines to 100 months, more than 50

9    percent than below the low end of the Sentencing Guidelines.

10        Now, I want to just mention --

11        THE COURT:  So what is going to happen here?  Is he

12   going to be denaturalized and deported?

13        MR. DEL TORO:  That depends, Judge.  What happens

14   generally is when there isn't a naturalization fraud violation

15   under 18 USC 1425, the Court can't automatically revoke his

16   citizenship as a course of the criminal proceedings.  So then

17   it becomes the Department of Homeland Security's issue and

18   they have to make a determination whether they will start

19   civil proceedings to denaturalize him.

20        In a case like this, they take this very seriously,

21   so that is a possibility.  But again, that is an executive

22   decision that is made by a different department.

23        Judge, I just wanted to cite for the Court one

24   additional issue.  Under 5G1.2(d), if the defendant had gone

25   to trial and he had been convicted of more than one offense,

1   the Court would have to essentially sentence him to

2   consecutive sentences to achieve the total sentence, which

3   would be the guideline sentence in this case.  So he would be

4   facing 210 to 262 months.  He is not because he pled guilty

5   and accepted responsibility.  But he got really a significant

6   reduction, a 30-month reduction.

7           In terms of deterrence, Judge, giving him a second

8   variance of 50 percent would create a disincentive for other

9   terrorism defendants to cooperate, because as the Court knows,

10  when the Government files a 5K1.1 motion or Rule 35 motion, we

11  generally ask somewhere between a third and 50 percent

12  reduction of the guideline sentence.

13          In this case he has already gotten a 30-month

14  reduction giving him a more than 50 percent reduction from the

15  low end of the guidelines.  Without having cooperated, without

16  having assisted the Government in finding other terrorists

17  that he conspired with would create a terrible disincentive to

18  other individuals charged with material support, terrorism,

19  like him, to cooperate with the Government because they know

20  that the Court is going to be lenient and they're going to be

21  able to get a significant variance or maybe two variances,

22  like in this case, without having to have said a single thing

23  about any coconspirator.

24          It would undermine essentially the ability of law

25  enforcement to secure cooperation in these very, very

1  significant crimes where cooperation is so crucial and so

2  essential for us to be able to protect the public.

3        THE COURT:  So, you know, I know I have a letter from

4  his father.  I guess I am still a little perplexed about how

5  the defendant came -- so the parents were living in California

6  with his siblings, is that right?  Maybe at this point you

7  should let the defense speak and then I'll let you rebut.

8        Are you making the presentation, Ms. Batoff?

9        MS. BATOFF:  Yes, Your Honor.

10       THE COURT:  Okay.  Fine.

11       MS. BATOFF:  Your Honor, the Government argues that

12  Mr. Mohammed has already received a 30-month variance.  But

13  this is not entirely true, because under 5G1.1(a) of the

14  guidelines, where the statutorily authorized maximum sentence

15  is less than the minimum of the applicable guideline range,

16  which is the case here, the statutorily authorized maximum

17  sentence shall be the guideline sentence.

18       THE COURT:  Right.

19       MS. BATOFF:  So under the guidelines we're starting

20  at 180 months.  We're not starting at --

21       THE COURT:  But that was the plea bargain.

22       MS. BATOFF:  Yes, it was, absolutely, Your Honor.

23       THE COURT:  Right.  And the plea bargain was a

24  benefit to him.

25       MS. BATOFF:  Absolutely, no question about it.

1          THE COURT:  Right.

2          MS. BATOFF:  But it's interesting that the Government

3    cited Jayyousi, because one of the things the Jayyousi Court

4    said -- and, of course, Your Honor knows that's the case where

5    the Court sent back to Judge Cooke the Jose Padilla

6    sentencing, because what the Court said in that case was that

7    you did not compare apples to apples.  That's what they said

8    to the District Court Judge.  You looked at cases where the

9    defendant pled guilty.  That was not the case with Jose

10   Padilla.  You looked at cases where the defendant had no

11   criminal history.  That was not the case with Jose Padilla.

12   He was a career offender.  And what the Government is asking

13   you to do by looking at the Khan case is compare apples to

14   oranges, and that's exactly what the Jayyousi Court said you

15   can't do.

16         THE COURT:  Well, look, I can't meaningfully compare

17   these cases without going through the records of them.  So

18   you're going to have to give me a lot more detail than appears

19   in your sentencing memorandum.  I don't care.  If we don't

20   sentence Mr. Mohammed till next year, the end of next year, it

21   makes no difference to me if this is what you want to do.

22         But you're going to have to give me the records, the

23   trial records, the factual proffers and everything else from

24   all of these cases if you want me to make a meaningful

25   comparison.  I can't do this based on little summaries that

1   are provided in sentencing memoranda.  This is way too serious

2   and way too detailed.

3         MS. BATOFF:  Your Honor, if you would like to give us

4   more time, we could certainly do that.  But I would like to

5   address what happened in the Khan case.  I have the sentencing

6   transcript here.  I have the Government's sentencing

7   memorandum.  I've pored over it carefully.

8         We didn't talk about Khan in our sentencing

9   memorandum because we didn't think it was analogous.  It's the

10  Government that brought up the Khan says, so now I would like

11  to respond to why that case is so different from this case.

12        THE COURT:  Okay.  Fine.

13        MS. BATOFF:  First of all, as you know, Khan went to

14  trial.  Mr. Mohammed pled guilty.  During trial, which was a

15  five-week trial, Khan testified for five days, and Judge Scola

16  found his conduct during those proceedings so perjurious,

17  evasive and obstructive that he went above what the Government

18  asked for in that case.  The Government asked for 15 years in

19  that case, which is interesting, Your Honor, because they're

20  asking for 15 years here, and the conduct of these two men

21  could not be different.

22        The first thing that is different, of course, is his

23  election to go to trial while Mr. Mohammed accepted

24  responsibility very early on and made it known from the very

25  beginning --

1      THE COURT:  Well, I'm not sure I understand what that

2  means.  What does that mean, he accepts responsibility?  Has

3  he renounced his political position?  Has he renounced his

4  allegiance to these insurgencies?  What does that mean he has

5  accepted responsibility?  I don't know.

6      MS. BATOFF:  He has stated, yes, I have committed a

7  crime, and that's what you're supposed to do under acceptance

8  of responsibility.

9      THE COURT:  But I don't know what that means on a

10  real level.  I mean, is he now a martyr?  I have no idea what

11  that means from the standpoint of my formulating an

12  appropriate sentence.  He says he committed a crime.  Has he

13  martyred himself?  I don't know.

14      MS. BATOFF:  I don't either.  I don't either, Your

15  Honor.

16      THE COURT:  So I can't take it into consideration.

17  That's the problem.  I cannot take it into consideration

18  without having some understanding of that.

19      MS. BATOFF:  But the difference that the JUC Court

20  focused on, one of the main differences, is Padilla went to

21  trial, whereas the cases where the judge --

22      THE COURT:  But the Eleventh Circuit took issue with

23  Judge Cooke's sentencing procedure.  If I were to sentence

24  Mr. Mohammed to the 15 years today, I daresay the Eleventh

25  Circuit would have no problem with that.  It would just get

1   affirmed and that would be the end of it.

2        I am giving consideration to your request for a

3   variance.  But to do that on a meaningful level, I have to

4   have something in front of me, and little summaries of what

5   went on in other cases isn't going to do it.  Hearing that he

6   admits he committed a crime isn't going to do it.  And I don't

7   know what will do it.

8        It seems to me that maybe we should just simply look

9   at the facts of what he did and just let me decide rather than

10  trying to make these comparisons, because I think it's really

11  an impossible task.

12        MS. BATOFF:  Your Honor, if I could just have one

13  more moment --

14        THE COURT:  Sure.

15        MS. BATOFF:  -- because I was going to tell you today

16  that I think that the case that is most similar that I have

17  cited in my memorandum is the case of Hor Akl, A-k-l.  That

18  was a case in Ohio.  And if Your Honor would indulge me, I

19  would just like to talk about the facts in that case for a

20  moment.

21        THE COURT:  Okay.  That's fine.

22        MS. BATOFF:  Because I do think it's very similar to

23  the facts here.

24        THE COURT:  That's fine.

25        MS. BATOFF:  And I would start out by saying --

1    THE COURT:  So remind me again -- I did read your

2  memorandum -- but remind me what year that was.

3    MS. BATOFF:  That was 2003, Your Honor.

4    THE COURT:  2003.  Right.  So things have, you know,

5  changed since 2003, you know, in terms of what kinds of

6  threats these kinds of crimes and these individuals pose to

7  the United States.

8    MS. BATOFF:  Your Honor, we should remember, though,

9  that 2003 was very close to the events of September 11th.  So

10  emotions were running high then as well.

11    THE COURT:  Right.  But there wasn't as much concern

12  about people being in the United States being a problem.

13    MS. BATOFF:  Your Honor, in that case Mr. Akl pled

14  guilty with his wife to conspiring to provide material support

15  to Hezbollah.

16    THE COURT:  I'm just trying to get to the page of

17  your memorandum.

18    MS. BATOFF:  Sure.  Your Honor, I'm sorry.

19    THE COURT:  What page is it on?

20    MS. BATOFF:  Let me find it for you.  I'm actually

21  reading from an outline.

22    THE COURT:  Okay.  I see Hamdam.

23    MS. BATOFF:  I think it's before -- it's on page 12,

24  Your Honor.

25    THE COURT:  Okay.  Oh, Akl.  Okay.

1          MS. BATOFF:  In that case, over the course of a year,

2  Mr. Akl planned to send up to a million dollars to Hezbollah.

3  The Akls, he and his wife, met multiple times between August

4  2009 -- I'm sorry.  That must be a typo then.

5          I'm not sure if I have the year wrong, Your Honor,

6  because --

7          THE COURT:  Well, it's a 2010 case.

8          MS. BATOFF:  Then I'm incorrect about the year, Your

9  Honor.

10          THE COURT:  Okay.

11          MS. BATOFF:  Yes.  You're right.  It is a 2010 case.

12  So that must have been a typo.  I apologize.

13          Between August 2009 and June of 2010, the Akls met

14  multiple times with a confidential source, similar to this

15  case, who was working on behalf of the FBI.  During those

16  meetings they discussed ways to secretly send money to

17  Hezbollah leaders in Lebanon.  Akl told the confidential

18  source he understood the money was being transported to

19  terrorists.  He also stated he understood the funds would be

20  used to target Israel.

21          So, similar to this case, you have someone who is

22  identifying the money to go to a specific purpose, an illegal

23  purpose.

24          The difference between this case and Akl -- and I

25  argue that Akl is kind of more serious -- is he actually

1  traveled to Lebanon to meet with a highly placed person in

2  Hezbollah, and while in Lebanon he discussed with Hezbollah a

3  plan to send funds to them concealed inside appliances and

4  automobiles shipped to Lebanon.  And in fact, when he got back

5  to the United States, he agreed to send the money that was

6  given to him by the confidential source by secreting it inside

7  a vehicle when they were going to send to Lebanon via a

8  container ship.

9       THE COURT:  Is the judge's decision in this case

10  published or available?

11       MS. BATOFF:  It's not published, Your Honor.  The

12  information I got was actually just from the Government's

13  sentencing memorandum, which I have here, and the plea

14  agreement and other documents.

15       THE COURT:  The Government's sentencing memorandum in

16  the Akl case or the Government's sentencing memorandum in this

17  case?

18       MS. BATOFF:  No.  I'm pretty sure I have the

19  Government's sentencing memorandum in the Akl case.  And the

20  reason I would look to that is that those would take the facts

21  in the light most unfavorable to the defendant.

22       But I would argue that this case is most similar to

23  Mr. Mohammed's, because we've got the same charge, although in

24  Akl he also pled guilty to money laundering, perjury and

25  bankruptcy fraud.  We have both defendants pleading guilty.

1   We have a case involving the sending of funds.  We have a

2   specific use of the funds discussed.

3           THE COURT:  But no recruitment.

4           MS. BATOFF:  No.  He traveled by himself to go meet

5   with a Hezbollah leader.  And we have no criminal history for

6   either Mr. Mohammed or Mr. Akl, as far as I could tell.  He

7   got 75 months.

8           With respect to recruitment, Your Honor, I certainly

9   cannot dispute that Mr. Mohammed spoke to his codefendant,

10  Said, about recruiting.  But when it came down to actually

11  sending passport copies and searching for people in Somalia to

12  go fight in Syria, that was Mr. Said's role.

13          THE COURT:  But did your client identify people to

14  Mr. Said to pursue for recruitment?

15          MS. BATOFF:  I think that he spoke about people with

16  Mr. Said, but there was no one he specifically identified and

17  followed up and made sure that he got sent anywhere.  He was

18  in a chat room, Your Honor.  That's how the Government came

19  to --

20          THE COURT:  Yes, I realize that.  I'm trying to

21  guard, frankly, against kind of backhanding away chat room

22  activity, because unfortunately, chat rooms are the way these

23  people communicate.

24          MS. BATOFF:  But I would emphasize for Your Honor

25  that Mr. Mohammed and Mr. Said each had their own respective

1  roles in this case.  Mr. Mohammed was clearly the money

2  person.  Mr. Said was mostly the recruiting person.  So I

3  think to sort of paint with a broadbrush and say Mr. Mohammed

4  was also recruiting, well, he was in a conspiracy with someone

5  who was recruiting.

6          THE COURT:  Well, Mr. Del Toro puts actual activities

7  at Mr. Mohammed's feet.  It's not that he was conspiring

8  simply with Mr. Said to recruit.  But Mr. Mohammed was

9  actively engaged in recruiting, according to Mr. Del Toro.

10          If you disagree, you need to tell me why.

11          MS. BATOFF:  I agree that he spoke with Said about

12  recruiting and he spoke with the OCE about recruiting.

13          THE COURT:  And he told them he was making efforts to

14  recruit.

15          MS. BATOFF:  He spoke to them about people who were

16  potential recruits, yes.  But he did not take any active steps

17  to get anyone from point A to point B.  That was Said.

18          So, Your Honor, the other case I thought was similar,

19  which I cited in my sentencing memo, was the case of Yahya

20  Goba, and Your Honor's familiar.  That's the Lackawanna Six

21  case.  In that case there was a group of young men who

22  actually traveled to Afghanistan to participate in a training

23  camp.  Mr. Goba was sort of the leader of that group and he

24  pled guilty to the same charge as Mr. Mohammed.  He originally

25  had a sentence with the agreement of the Government -- this

1  was by plea agreement -- of 120 months.  He cooperated and

2  after cooperation he got 108 months.

3          THE COURT:  Right.  So it's very interesting.  I

4  mean, the problem with these cases is they're all over the

5  map.  You can be Osama Bin Laden's driver and get a relatively

6  light sentence, and you can be a guy who sent money and get a

7  horrific sentence.  The cases are all over the map and they

8  just don't provide any guidance really.  It's a nightmare.

9          MR. DEL TORO:  And, Judge, that is a point that we

10 made in our brief, that really, the best way to avoid

11 sentencing disparities is for the Court to sentence

12 Mr. Mohammed and Mr. Said consistently with each other.  But

13 to look outside of the facts in this case can be a futile

14 exercise.

15          I mean, I can certainly respond to additional

16 distinctions of the Akl case and the Yahya case or the Goba

17 case for the Court.  There is clearly significantly more

18 activity that happened in the instant case.

19          THE COURT:  Well, it looked like the Akls were pretty

20 up to their ears in it.  It's a lot more money and they're

21 putting money in automobile parts to conceal it and ship it.

22 You know, it's not exactly passive activity.

23          MR. DEL TORO:  But in this case you have both active

24 recruiting -- he talked to three different people, about six

25 potential different recruits for either al-Shabaab or al-Nusra

1   Front.  He talked to the CHS, to Raja Tu Akan and the OCE

2   either trying to recruit them individually or getting recruits

3   through Said.  And obviously, this is a designated terrorist

4   organization or multiple designated terrorist organizations.

5   There is a compartmentalization of their roles.

6           What happened in this case is the defendant went

7   outside of his usual role, which is a financier, a material

8   supporter, somebody who funds the weapons, the killing itself,

9   to do additional activities, including recruit and direct how

10  the funds should be used.  And I think that is a distinctive

11  factor in this case.  The defendant specifically approved the

12  use of his funds for an attack on Americans and on the United

13  Nations.  That is qualitatively different.

14          It is also qualitatively different that he was

15  involved in support activities for al-Shabaab through Said for

16  a long time before the OCE was even involved.  We have those

17  Western Union records.  We have his admissions to the OCE

18  about his prior conduct and the fact that it was for the

19  purpose of supporting al-Shabaab.

20          So, unlike Akl where it's a sting operation where the

21  Government provides $100,000, $200,000 to the defendant, in

22  this case the defendant raised the funds, recruited

23  individuals, sent the funds and directed that they be used to

24  kill Americans.

25          THE COURT:  So the next time that you're in a sting

1  case, Ms. Batoff, you can argue it's just a sting, the

2  defendant didn't really mean it.

3            MS. BATOFF:  Right.  Well, I sort of feel that way

4  with the Khan case, because the Government's own sentencing

5  memorandum in that case highlights what a different case that

6  was from this case, and that's the case they're primarily

7  relying on.

8            They said in their sentencing memo:  "On top of his

9  false testimony, Khan tried repeatedly to disrupt the process

10  during cross-examination.  Rather than answer questions in a

11  straightforward manner as he generally did on his own

12  counsel's examination, Khan on cross simply refused to give

13  any direct answers.  No matter how many times certain

14  questions were put to him, he would not answer, choosing

15  instead to talk about a different subject, to feign confusion

16  are or simply to insult prosecutors or the FBI."

17            And in that case the Government asked for 15 years.

18            THE COURT:  Right.

19            MS. BATOFF:  I would also add that Your Honor was

20  correct.  He wasn't Imam of a mosque.  He actually had

21  unwitting participants.  He collected money from people in his

22  congregation lying to them, telling them this was going to

23  humanitarian aid.  He could have gotten these people in

24  trouble, and that is the fact that the Judge considered, Judge

25  Scola considered, in sentencing him to 25 years.

1       But I think it's important to note that the
2  Government asked for 15 years in a case where someone got on
3  the stand, repeatedly lied.  Judge Scola had very strong
4  language in the sentencing transcript:  "I know that the
5  defense has pointed out a number of other cases which they
6  argue are similarly situated with this case but I" --
7       THE COURT:  So I was just going to ask is -- let's go
8  back to your point about the Padilla case.
9       So Khan went to trial.  What about McField-Bent?  Did
10 he go to trial?  Franklin William McField Bent.
11      MS. BATOFF:  Is that a case that Probation provided,
12 Your Honor?
13      THE COURT:  Yes.  You don't know about him?
14      MS. BATOFF:  No.
15      THE COURT:  Okay.  How about do we know about Carlos
16 Arteaga-Tapia?
17      MS. BATOFF:  No, Your Honor.
18      THE COURT:  No.  How about Osmond Tobias-Rodriguez?
19 Do we know about him?
20      MS. BATOFF:  No, Your Honor.
21      THE COURT:  No.
22      Okay.  How about Narseal Batiste, Stanley Grant
23 Phanor and these other guys who were all sentenced in November
24 2009?  Those were all the Liberty City people.
25      MS. BATOFF:  Yes, Your Honor.  They actually had

1  multiple trials, if I remember correctly.

2          THE COURT:  Okay.  So, nobody can tell me about the

3  McField-Bent case.  But that defendant got 180 months that was

4  reduced to 157.

5          So the only other person who's at the 180 or greater

6  range is Khan at 300 months; and I agree, if we want to do

7  comparisons, he's not an appropriate comparitor.

8          So, basically, these sentences in this district, the

9  McField-Bent case and the Khan sentences, are outliers.  The

10  real range in this district has been 50 months to 135 months,

11  except for Batiste, who got 162 months.

12          So, if we want to do it this way, we want to look at

13  what happened to other people, that's the range.

14          MR. DEL TORO:  And, Judge, the Government's argument

15  is that we shouldn't do it that way, because it really isn't a

16  meaningful exercise.  Just as the Court said when you started,

17  you really have to look at the individual facts of this case.

18          I mean, counsel says that Khan is not an analogous

19  case because it went to trial.

20          THE COURT:  If you don't look at the facts, all you

21  can do is use this as a range, right?

22          MR. DEL TORO:  Right.

23          THE COURT:  And you can try to figure out what's an

24  outlier, what's a real range.  And the real range is really 50

25  months to 135.

1        MR. DEL TORO:  But I think you do have to look at the

2   facts, because I think that is what informs the Court as to

3   the seriousness of the offense, the need to create deterrence,

4   the need for incapacitation.  Without looking at the facts

5   there really --

6        THE COURT:  Let me say this.  I think there are a lot

7   of competing factors here.  I mean, we can look at it this

8   way, and maybe the Eleventh Circuit created a problem because

9   of the way they dealt with Padilla.  The range is between 50

10  months and 135 months.  Probably some of these people did more

11  serious things than this defendant and probably some of them

12  did less serious things.

13        But we can say the range in this district, except for

14  these outliers, has been about 50 to 135 months.  But there

15  are some other factors, I think, that need to be taken into

16  consideration here.

17        For one thing, we do have a heightened concern in the

18  current climate as to people living in the United States whose

19  allegiances are elsewhere and who intend to do harm to the

20  United States assets and residents.  It's a fact and that fact

21  dovetails into general deterrence, and I can't ignore that.

22  It's an important fact.

23        Then we have specific deterrence.  I have a big

24  problem here.  I don't understand who your client is.  He has

25  admitted to a crime.  I don't know what that means in terms of

1  actual acceptance of responsibility.  It might be legal

2  acceptance of responsibility.  But, of course, one of the many

3  issues in sentencing is remorse and sincerity of remorse.  I

4  have no reason to think your client is remorseful.  Maybe he

5  is, but I don't have anything in front of me to suggest that

6  he is.  Yes, he pled guilty.  But he had a lot of incentives

7  to plead guilty beyond remorse.

8        So I don't really know anything about the individual

9  characteristics of the defendant.  But I do know it's a very

10  serious crime and I do know there's a need for general

11  deterrence.

12        So I have a range.  I have a recognition that there's

13  a need for general deterrence; that perhaps that need is

14  heightened by the current state of insurgencies in the world

15  and their stated objectives.

16        I don't know anything about the individual

17  characteristics of the defendant that matter.  I haven't heard

18  that he's remorseful.  I haven't heard that he has renounced

19  these kinds of activities.  I'm having a little problem here

20  and I need some help from the defense.

21        MS. BATOFF:  May I have a moment, Your Honor?

22        THE COURT:  Yes.

23        (Pause)

24        THE COURT:  And if you need more time, I don't have a

25  problem giving it to you.

1          MR. DEL TORO:  Judge, I would like to speak to the

2    question of remorse and potential for rehabilitation

3    because --

4          THE COURT:  Well, you did already speak to it.

5          MR. DEL TORO:  There are facts that I haven't

6    proffered to the Court which are in discovery, which come from

7    public sources, from websites where recordings are left and

8    where the defendant actually cheered the deaths of American

9    soldiers in early 2011; where the defendant, on September 11,

10   2011, read the news in the chat room --

11         THE COURT:  Right.  Those are things that occurred

12   while the crime was being committed.  I'm more interested in

13   where is the defendant now.

14         MR. DEL TORO:  I understand, Judge.  But I think it's

15   instructive as to his potential rehabilitation and the

16   interests of society to be protected from those crimes,

17   because that's not an easy pivot.  That's not an easy

18   180-degree pivot.  It's not a drug trafficker who realizes

19   this was really stupid; I hurt my family.  This is a deep

20   ingrained ideological belief that's not as easy to pivot

21   from.

22         So when he says on the tenth anniversary of 9-11, he

23   refers to it as the tenth anniversary of the blessed day of

24   September 11, 2001, I think that's something that really does

25   help the Court in figuring out who this person is.  It's not

1  easy to just go 180 degrees from that.

2          MS. BATOFF:  Judge, Mr. Mohammed has told us that he

3  is deeply remorseful for letting himself get into this so deep

4  and that he does renounce his allegiance to these

5  organizations.

6          THE COURT:  Yeah.  Is he going to say that or you're

7  only going to say that?

8          MS. BATOFF:  Your Honor, he was not prepared to make

9  a statement today.

10          THE COURT:  Okay.  Well, I think then we have to put

11  the sentencing off if we want to pursue a variance, because

12  there isn't going to be a variance unless I hear a

13  renunciation, and a meaningful renunciation.

14          So how much time would you like?

15          MS. BATOFF:  Could we do it the week of December 1st,

16  Your Honor?

17          THE COURT:  I have no problem with that.

18          So just give me a date and a time, Kathryn.

19          THE COURTROOM DEPUTY:  December 3rd at eleven

20  o'clock.

21          THE COURT:  Okay.  December 3rd at eleven o'clock.

22  Okay?

23          MS. BATOFF:  Thank you, Judge.

24          THE COURT:  Okay.  Thank you.

25          I just wanted to make clear while you all are still

1 here, including Mr. Mohammed, that I didn't mean to convey

2 that that was all I wanted to hear.  I want a hear a lot more

3 about who this man is.

4        MS. BATOFF:  Yes, Your Honor.

5        THE COURT:  Okay.

6        MS. BHARATHI:  Understood, Judge.

7        THE COURT:  All right.  Thank you.

8        (Recessed at 2:32 p.m.)

9    *   *   *   *   *   *   *   *   *   *

10                C E R T I F I C A T E

11

12     I certify that the foregoing is a correct transcript

13 from the record of proceedings in the above-entitled matter.

14

15

16

17

18

19

20

21

22

23

24

25